246 P.3d 550 (2011)
In the Matter of the DETENTION OF Calvin TICESON, Appellant.
No. 63122-5-I.
Court of Appeals of Washington, Division 1.
January 18, 2011.
*551 Andrew Peter Zinner, Nielsen Broman Koch, Seattle, WA, for Appellant.
David J.W. Hackett, Alison M. Bogar, King County Prosecutor's Office, Seattle, WA, for Respondent.
ELLINGTON, J.
¶ 1 Calvin Ticeson was committed as a sexually violent predator. In this appeal, he contends the court erred by failing to require jury unanimity as to whether he suffered from a mental abnormality and/or personality disorder which made him likely to engage in predatory acts of sexual violence if not confined to a secure facility. Ticeson also assigns error to the court's in-chambers conferences, arguing this violated his rights to an open, public trial. We hold the court did not err in failing to provide a unanimity instruction, Ticeson is not a criminal defendant and has no rights under article I, section 22 of the Washington Constitution, and the public *552 right to an open proceeding under article I, section 10 was not violated by in-chambers conferences that dealt with purely legal matters. We affirm.

BACKGROUND
¶ 2 On February 13, 2009, a jury found Calvin Ticeson to be a sexually violent predator (SVP) under chapter 71.09 RCW (SVP statute), and the court entered an order of commitment for his indefinite confinement.
¶ 3 The SVP statute required the State to prove beyond a reasonable doubt that (1) Ticeson has been convicted of a crime of sexual violence; (2) Ticeson suffers from a mental abnormality and/or personality disorder which causes serious difficulty in controlling his sexually violent behavior; and (3) Ticeson's mental abnormality and/or personality disorder makes him likely to engage in predatory acts of sexual violence if not confined to a secure facility.[1]
¶ 4 Ticeson's convictions for crimes of sexual violence are undisputed. As to the second and third statutory elements, the jury heard testimony from the State's expert, Dr. Brian Judd, and from Ticeson's expert, Dr. Theodore Donaldson.
¶ 5 Briefly summarized, Judd testified Ticeson suffers from a mental abnormality called paraphilia not otherwise specified, nonconsent (paraphilia NOS-NC), which predisposes Ticeson to committing violent sexual acts. Judd testified that, if released, Ticeson would be a menace to the health and safety of others.
¶ 6 Judd also diagnosed Ticeson with a personality disorder called personality disorder not otherwise specified, with antisocial traits (personality disorder NOS), which in his opinion causes Ticeson to have difficulty controlling his behavior. He noted that Ticeson continued committing assaults despite repetitive incarcerations, concurrent supervision, or within short periods of time after release from custody. Judd agreed that this disorder does not usually cause a person to engage in predatory acts of sexual violence.
¶ 7 Donaldson disagreed with Judd's diagnosis of paraphilia NOS-NC. He did not dispute Judd's diagnosis of personality disorder NOS, but did not agree that Ticeson currently suffers from the disorder, and noted that even if he did, it would not cause difficulty controlling sexually violent behavior.
¶ 8 The court instructed the jury it must determine whether Ticeson suffers from "a mental abnormality and/or personality disorder"[2] that makes him likely to reoffend, and that "to return a verdict all jurors must agree."[3]
¶ 9 On the first day of proceedings, the court held an in-chambers conference during the lunch break to discuss the admissibility of certain deposition testimony. After the break, the court recapped on the record what had occurred in chambers.
¶ 10 At the start of proceedings on the second day of trial, the court explained it had held another in-chambers conference: "We held a conference in chambers. . . . We talked about the deposition of Tedra Howard and the Court made rulings on the noted defense objections. And the State also agreed to strike a number of items that the defense had objected to."[4] The court did not further specify what had occurred.

DISCUSSION

In-Chambers Conferences
¶ 11 Ticeson contends the in-chambers conferences violated his right to a public trial under the Washington Constitution, article I, section 22 and his public right to open proceedings under the Washington Constitution, article I, section 10. Whether the right to a public trial has been violated is a question of law reviewed de novo.[5] "This standard *553 applies to civil as well as criminal appeals."[6]
¶ 12 Article I, section 10 (Section 10) of the Washington Constitution provides, "Justice. . . shall be administered openly."[7] The Sixth Amendment to the United States Constitution and article I, section 22 (Section 22) of the Washington Constitution also guarantee criminal defendants the right to a public trial. To protect both Section 10 and Section 22 rights, a trial court must address the five Bone-Club factors before restricting public access to judicial proceedings:
"(1) The proponent of closure . . . must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a `serious and imminent threat' to that right.
"(2) Anyone present when the closure motion is made must be given an opportunity to object to the closure.
"(3) The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
"(4) The court must weigh the competing interests of the proponent of closure and the public.
"(5) The order must be no broader in its application or duration than necessary to serve its purpose."[[8]]
The court has an independent obligation to perform a Bone-Club analysis where appropriate.[9]

Article I, Section 22
¶ 13 Ticeson contends the right of a criminal defendant to a public trial conferred by Section 22 should extend to respondents in civil SVP cases.
¶ 14 As Ticeson points out, SVP proceedings share some characteristics of a criminal trial, including the beyond a reasonable doubt standard and the requirement that the jury be unanimous.[10] These guarantees are necessary to satisfy due process because of the serious restraint on liberty resulting from civil commitment as an SVP.[11]
¶ 15 An SVP case is, however, a civil proceeding,[12] and the consequences of an SVP finding are not equivalent to a criminal conviction. Punishment is not the purpose of confinement under the SVP statute.[13] Washington courts have recognized this, and have repeatedly refused to confer upon SVP respondents the same rights as criminal defendants.[14] Ticeson's argument rests upon his *554 view that the public right to open proceedings and the criminal's right to a public trial are "inextricably intertwined" and upon the fact that SVP proceedings "share other characteristics of a criminal trial."[15] Both those observations are true, but neither separately nor together do they support extending Section 22 beyond its express intent. Further, as discussed below, Section 10 protects public trial rights in civil cases.
¶ 16 The SVP statute is resolutely civil. We decline to extend Section 22 to civil cases.

Article I, Section 10
¶ 17 Section 10 reads, in full: "Justice in all cases shall be administered openly, and without unnecessary delay."[16]
¶ 18 The State contends Ticeson cannot assert rights under this section because a right belonging to others may be raised by a litigant only when the litigant can establish third party standing.[17] But Ticeson is a member of the public, and like everyone else is protected by Section 10. We see no reason to apply the third party standing rule to rights granted to the public at large. We thus reject the approach taken in State v. Wise,[18] in which Division Two of this court held a criminal appellant could not raise Section 10 rights because he lacked third party standing.[19]
¶ 19 As Ticeson contends, Section 22 and Section 10 are closely related, and in several Section 22 cases, our Supreme Court has, often sua sponte, also discussed Section 10.[20] It seems clear that although they have somewhat different purposes, the two sections confer essentially the same rights and share a common concern of fairness.[21] Further, the two sections require the same analysis before proceedings are closed to the public.[22]
¶ 20 It is well settled that a criminal defendant may raise the Section 22 right to a public trial for the first time on appeal and will enjoy a presumption of prejudice where the right has been violated.[23] Washington courts have not, however, discussed whether the Section 10 right, standing alone, may be raised for the first time in a civil appeal. We hold it may, under RAP 2.5.
¶ 21 RAP 2.5(a)(3) allows a party to raise a manifest constitutional error for the first time on appeal. Improper courtroom closure is a constitutional error. Thus, Ticeson may raise the issue for the first time in this civil appeal. As required by RAP 2.5, *555 however, he must demonstrate that the constitutional error had identifiable and practical consequences in his trial.[24] He has not done so. Rather, he relies on the presumption of prejudice enjoyed by criminal defendants. This does not satisfy the rule. Ticeson's failure to object below therefore constitutes waiver of review.
¶ 22 We reject Ticeson's argument that his silence did not waive his public trial rights for another reason, as well. In criminal cases, the court must ensure that any waiver of Section 22 rights is knowing, intelligent and voluntarywhich means the court must be sure the defendant knew he possessed such a right and knowingly waived it.[25] But if the same test applies to Section 10 rights, the court would be required to ensure, sua sponte, that all parties (and possibly, everyone in the courtroom), know about and waive any rights under Section 10. Otherwise, the losing party may raise the issue for the first time on appeal, and the only remedy is reversal. This is an unjust and costly proposition and the rule does not permit it. A party who perceives a possible violation of Section 10 must make its argument to the trial judge, thereby ensuring a record for review.
¶ 23 Had Ticeson lodged an objection, however, our ruling would be the same.
¶ 24 The trial court conducted two chambers conferences outside usual trial hours, to discuss evidentiary objections and make rulings. The court then made a record describing the conferences. This did not violate the public's right to open proceedings.
¶ 25 Public trial rights "ensure a fair trial," "foster the public's understanding and trust in our judicial system, and to give judges the check of public scrutiny."[26] None of these purposes is served by eliminating a trial judge's discretion to handle ministerial or purely legal matters informally in chambers.[27] Rather, public trial rights apply to "adversary proceedings," including presentation of evidence, suppression hearings, and jury selection.[28] The resolution of "`purely ministerial or legal issues that do not require the resolution of disputed facts'" is not an adversary proceeding.[29]
¶ 26 A review of the history of the public trial right confirms this conclusion. The public's right to open court proceedings dates back to the days before the Norman Conquest,[30] and was included in the very first draft of our state constitution.[31] The founders also created the office of court commissioner: "There may be appointed in each county . . . one or more court commissioners,. . . who shall have authority to perform like duties as a judge of the superior court at *556 chambers."[32] The powers of a judge in chambers thus describe the powers of commissioners.
¶ 27 The implementing statute provides that court commissioners may hear and determine all probate matters, grant defaults and judgment thereon, and issue restraining orders.[33] In the early days of our state, our Supreme Court upheld a judgment entered by a commissioner, making the following observations about the powers of judges in chambers:
Under our present system, when an act of a judicial nature is performed by the judge, it is, in contemplation of law, done in open court, although the act may in reality be done in the private room or office of the judge. When the framers of the constitution used the term "at chambers" in speaking of the duties performed by the judges at chambers, they had in view a certain object, and, in order to ascertain what this was, we must have recourse to the meaning of the term "at chambers" as it was understood at the time this particular provision of the constitution was framed. . . . Under the law as it then existed, judges of territorial courts could at chambers entertain, try, hear, and determine all actions, causes, motions, demurrers, and other matters not requiring a trial by jury."[[34]]
¶ 28 In 1909, the court considered the validity of a divorce decree where an order denying a motion to vacate the decree was signed in chambers.[35] The court held "it cannot be successfully contended that an act done by a judge sitting on the bench where no jury is required has any greater legal force than the same act done by him in an adjoining room, by courtesy styled his chambers."[36]
¶ 29 These cases illustrate the framers' understanding of what judges may do in chambers, outside the public presence. It is generally consistent with our understanding today, a hundred years later.[37]
¶ 30 Ticeson offers no response to this history. Instead, he demands a full Bone-Club analysis before every in-chambers or sidebar discussion (unless, as he suggested at oral argument, the topic is limited to the time of the noon recess). Ticeson would have us hold that a judge cannot, in chambers, sign an agreed order; hold pretrial conferences; speak privately with counsel to caution against uncivil behavior; inquire as to the time needed for remaining witnesses; discuss jury instructions; or do any of the myriad things judges do in chambers to ensure trials are fair and to save time.[38]
¶ 31 The public trial right is not served by such a reading, and the ability of judges to make legal rulings or solve case management issues during recess, when courtroom staff are unavailable, would be greatly hindered without a corresponding public benefit. Nothing in the history of our state constitution supports this interpretation of Section 10.
¶ 32 So long as the trial itself is open, in-chambers discussion of legal or trial management issues does not amount to a closure of proceedings in violation of Section 10. The in-chambers discussions that occurred here involved only legal issues. There was no violation of the public's right to open proceedings.
*557 ¶ 33 As noted before, Ticeson did not object below. Unlike a criminal defendant who may raise the right to a public trial for the first time on appeal and has the benefit of a presumption of prejudice, a civil litigant who fails to raise a Section 10 objection at trial may raise it for the first time on appeal only under RAP 2.5(a)(3).[39]
¶ 34 Ticeson has failed to show either a violation of the public right to open proceedings or a practical consequence affecting the fairness of his trial. Ticeson's Section 10 claim fails.[40]

Unanimity instruction
¶ 35 Ticeson contends the court erred in failing to provide a unanimity instruction. The State first argues we should decline to review this argument because Ticeson failed to raise it below. Under RAP 2.5(a)(3), a party may raise an issue he did not object to at trial if it is a "manifest error affecting a constitutional right."
¶ 36 The lack of a required unanimity instruction has been held to be an error of constitutional magnitude.[41] The State contends the right to a unanimous jury verdict in SVP proceedings is statutory, not constitutional.[42] However, In re Detention of Halgren makes clear that due process requires jury unanimity in SVP cases.[43] Therefore, this is an issue of constitutional magnitude subject to review for the first time on appeal under RAP 2.5(a)(3).[44] Our review is de novo.[45]
¶ 37 Under Halgren, the presence of a disorder and/or abnormality are two alternative means of establishing the mental illness element of an SVP commitment determination.[46] Where an element may be established by alternative means, a particularized expression of unanimity as to the means relied upon to reach the verdict is not required so long as there is substantial evidence to support a verdict on each alternative.[47] If a rational juror could have found each means proved beyond a reasonable doubt, no unanimity instruction is necessary.[48]
¶ 38 Ticeson concedes the State presented sufficient evidence to prove he suffers from a mental abnormality, paraphilia NOS-NC, which causes him serious difficulty controlling sexually violent behavior and makes him likely to engage in predatory acts of sexual violence if not confined. He also concedes the State presented sufficient evidence to prove he suffers from a personality disorder, personality disorder NOS, with antisocial traits.
*558 ¶ 39 He contends, however, that the State failed to present evidence sufficient to prove that this personality disorder makes him likely to reoffend. He thus argues a unanimity instruction was constitutionally required.
¶ 40 The record belies his argument. Dr. Judd testified that Ticeson's personality disorder causes him serious difficulty controlling his sexually violent behavior. This testimony is sufficient to allow a rational juror to find Ticeson's personality disorder makes him likely to reoffend.[49] There is thus substantial evidence to support either alternative means. No unanimity instruction was required.
¶ 41 Affirmed.
WE CONCUR: LEACH, A.C.J., and COX, J.
NOTES
[1] RCW 71.09.020(18), .060(1).
[2] Clerk's Papers (CP) at 338.
[3] CP at 356.
[4] Report of Proceedings (Feb. 4, 2009) at 2.
[5] State v. Brightman, 155 Wash.2d 506, 514, 122 P.3d 150 (2005).
[6] In re Det. of D.F.F., 144 Wash.App. 214, 218, 183 P.3d 302 (2008).
[7] See State v. Easterling, 157 Wash.2d 167, 174, 137 P.3d 825 (2006) (citing Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 36, 640 P.2d 716 (1982)).
[8] State v. Bone-Club, 128 Wash.2d 254, 258-59, 906 P.2d 325 (1995) (alteration in original) (quoting Allied Daily Newspapers of Wash. v. Eikenberry, 121 Wash.2d 205, 210-11, 848 P.2d 1258 (1993)).
[9] State v. Strode, 167 Wash.2d 222, 229-30, 217 P.3d 310 (2009).
[10] In re Det. of Halgren, 156 Wash.2d 795, 808-09, 132 P.3d 714 (2006).
[11] RCW 71.09.060(1); In re Det. of Thorell, 149 Wash.2d 724, 731, 72 P.3d 708 (2003) ("[c]ommitment for any reason constitutes a significant deprivation of liberty triggering due process protection"); In re Det. of Young, 122 Wash.2d 1, 50, 857 P.2d 989 (1993). To determine what process is due, courts apply the test enunciated in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), which balances (1) the private interest affected; (2) the risk of erroneous deprivation of that interest under existing procedures and the probable value of additional safeguards; and (3) the governmental interest, including costs and administrative burdens, of additional procedures. See also Young, 122 Wash.2d at 43-44, 857 P.2d 989.
[12] Young, 122 Wash.2d at 23, 857 P.2d 989.
[13] Id. at 18-25, 51, 857 P.2d 989 ("`the State serves its purpose of treating rather than punishing sexually dangerous persons by committing them to an institution expressly designed to provide psychiatric care and treatment'" (quoting Allen v. Illinois, 478 U.S. 364, 373-74, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986))).
[14] In re Det. of Stout, 159 Wash.2d 357, 369-71, 150 P.3d 86 (2007) (no Sixth Amendment right to confront witnesses in SVP proceeding); Young, 122 Wash.2d at 21-26, 51, 857 P.2d 989 (refusing to apply the ex post facto and double jeopardy clauses and the Fifth Amendment privilege against compulsory self-incrimination in SVP proceedings); In re Det. of Aqui, 84 Wash.App. 88, 101, 929 P.2d 436 (1996) (refusing to apply the rule of lenity and presumption of innocence in SVP cases), abrogated on other grounds by In re Det. of Henrickson, 140 Wash.2d 686, 2 P.3d 473 (2000).
[15] Appellant's Br. at 31.
[16] (Emphasis added.)
[17] Powers v. Ohio, 499 U.S. 400, 410-11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); Ludwig v. Dep't of Ret. Sys., 131 Wash.App. 379, 385, 127 P.3d 781 (2006).
[18] 148 Wash.App. 425, 200 P.3d 266 (2009), rev. granted, 170 Wash.2d 1009, 236 P.3d 207 (2010).
[19] Wise could properly be said to have no Section 10 standing because he waived his Section 22 rights, which serve complementary and interdependent functions. See State v. Momah, 167 Wash.2d 140, 156, 217 P.3d 321 (2009) (defendant waived right to assert both Section 22 and Section 10 public trial rights claims on appeal by affirmatively accepting closure, arguing for its expansion, actively participating in it, and seeking benefit from it); Strode, 167 Wash.2d at 229, 217 P.3d 310 (defendant cannot waive public's right to open proceedings); Bone-Club, 128 Wash.2d at 259, 906 P.2d 325 (Section 10 and Section 22 complementary and interdependent functions in assuring fairness in our judicial system).
[20] See Strode, 167 Wash.2d at 225-26, 229-31, 217 P.3d 310 (closure violated Sections 10 and 22, defendant did not waive Section 22 and cannot waive Section 10 on behalf of the public; new trial); Momah, 167 Wash.2d at 147, 155-56, 217 P.3d 321 (Sections 10 and 22 serve complementary and interdependent functions, and are primarily for the benefit of the accused, defendant waived Section 22 public trial rights by affirmative conduct; conviction affirmed); State v. Easterling, 157 Wash.2d 167, 173-74, 179, 181-82, 137 P.3d 825 (2006) (closure violated Sections 10 and 22; new trial).
[21] See Easterling, 157 Wash.2d at 179, 137 P.3d 825 (citing Press-Enter. Co. v. Superior Court, 478 U.S. 1, 7, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986)).
[22] In re Pers. Restraint of Orange, 152 Wash.2d 795, 805-06, 100 P.3d 291 (2004).
[23] Strode, 167 Wash.2d at 231, 217 P.3d 310.
[24] State v. Holzknecht, 157 Wash.App. 754, 760, 238 P.3d 1233 (2010).
[25] Strode, 167 Wash.2d at 229 n. 3, 217 P.3d 310.
[26] Brightman, 155 Wash.2d at 514, 122 P.3d 150; Dreiling v. Jain, 151 Wash.2d 900, 903, 93 P.3d 861 (2004).
[27] It will usually be wise for trial courts to state for the record the nature and result of sidebar discussions or chambers conferences that take place after trial begins. See, e.g., State v. Koss, 158 Wash.App. 8, 241 P.3d 415, 418 (2010) (record showed closed proceedings involving language of jury instruction were of purely ministerial legal nature and therefore not in violation of public trial right); State v. Sadler, 147 Wash.App. 97, 114, 193 P.3d 1108 (2008) (record showed closed proceedings involved question of fact about discriminatory intent and were therefore in violation of public trial right where no Bone-Club analysis); State v. Rivera, 108 Wash.App. 645, 653, 32 P.3d 292 (2001) (record showed closed proceedings regarding hygiene complaints of juror were of ministerial nature and therefore not in violation of public trial right).
[28] Koss, 241 P.3d at 418 (citing Sadler, 147 Wash.App. at 114, 193 P.3d 1108: Rivera, 108 Wash.App. at 645, 32 P.3d 292).
[29] Id. (quoting Sadler, 147 Wash.App. at 114, 193 P.3d 1108).
[30] See Press-Enter. Co. v. Superior Court, 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984).
[31] WASH. CONST. of 1878 (not adopted), art. V, §§ 9 ("all courts shall be open to the public"), 13 ("the accused shall have a right to . . . a public trial"), http://www.sos.wa.gov/_assets/history/1878constitution.pdf. The voters of Washington ratified the 1878 constitution, but Congress did not approve the official state constitution until 1889. Washington History, WASH. SEC'Y OF STATE, http://www.sos.wa.gov/history/constitution.aspx (last visited Jan. 4, 2011).
[32] WASH. CONST. art. IV, § 23 (emphasis added).
[33] RCW 2.24.040.
[34] Peterson v. Dillon, 27 Wash. 78, 83-84, 67 P. 397 (1901) (emphasis added).
[35] Meisenheimer v. Meisenheimer, 55 Wash. 32, 42, 104 P. 159 (1909).
[36] Id. at 42-43, 104 P. 159.
[37] This is not to suggest judges can conduct bench trials in chambers. RCW 4.44.060 provides that the order of proceedings in bench trials shall be the same as in jury trials (the presentation of evidence is done in open court).
[38] In the case of sidebar discussions, issues arising with the jury present would always require interrupting trial to send the jury to the jury room, often located some distance from the courtroom, thereby occasioning long delays every time the court wishes to caution counsel or hear more than a simple "objection, Your Honor." This would do nothing to make the trial more fair, to foster public trust, or to serve as a check on judges by way of public scrutiny.
[39] Holzknecht, 157 Wash.App. at 759-60, 238 P.3d 1233.
[40] The State contends that even if the court violated Ticeson's right to a public trial by holding in-chambers conferences, the violation was de minimis. Washington courts have never found a public trial right violation to be de minimis. Strode, 167 Wash.2d at 230, 217 P.3d 310 (quoting Easterling, 157 Wash.2d at 180, 137 P.3d 825).
[41] Halgren, 156 Wash.2d at 807-08, 132 P.3d 714 ("a defendant in [SVP] proceedings is entitled to due process protections that include a unanimous jury verdict") (citing Young, 122 Wash.2d at 48, 857 P.2d 989).
[42] See RCW 71.09.060(1). The State also argues that the doctrine of invited error precludes this issue on appeal, regardless of any constitutional implications. See State v. Henderson, 114 Wash.2d 867, 868-71, 792 P.2d 514 (1990). Failure to request a required jury instruction, however, does not constitute invited error. See City of Seattle v. Patu, 147 Wash.2d 717, 720-21, 58 P.3d 273 (2002).
[43] Halgren, 156 Wash.2d at 807-08 n. 4, 132 P.3d 714 (noting that, subsequent to Young, the statute was amended to explicitly require a unanimous verdict).
[44] For a slightly different analysis, see In re Det. of Sease, 149 Wash.App. 66, 74-75, 201 P.3d 1078, review denied, 166 Wash.2d 1029, 217 P.3d 337 (2009).
[45] In re Det. of Keeney, 141 Wash.App. 318, 327, 169 P.3d 852 (2007).
[46] Halgren, 156 Wash.2d at 811, 132 P.3d 714; In re Det. of Pouncy, 144 Wash.App. 609, 618, 184 P.3d 651 (2008), aff'd, 168 Wash.2d 382, 229 P.3d 678 (2010).
[47] Halgren, 156 Wash.2d at 809, 132 P.3d 714; see also State v. Ortega-Martinez, 124 Wash.2d 702, 707-08, 881 P.2d 231 (1994); State v. Arndt, 87 Wash.2d 374, 376-77, 553 P.2d 1328 (1976).
[48] Halgren, 156 Wash.2d at 811-12, 132 P.3d 714.
[49] Insofar as the parties' experts disagreed with one another, this goes to the weight of the evidence rather than to its admissibility. Weighing expert testimony requires a credibility determination for the trier of fact, and is therefore not subject to this court's review. Sease, 149 Wash. App. at 80, 201 P.3d 1078.