

FILED
COURT OF APPEALS
STATE OF WASHINGTON

2013 AUG -5 AM 8: 46

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Detention of | ) | No. 68147-8-I |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| DARIN DILLINGHAM, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: August 5, 2013 |
| | ) | |

VERELLEN, J. — Darin Dillingham appeals from the order committing him to the custody of the Department of Social and Health Services (DSHS) pursuant to a jury verdict determining that he was a sexually violent predator (SVP) as defined by RCW 71.09.060. He first contends the State failed to present sufficient evidence to establish that he had both a mental abnormality and a personality disorder, and that the trial court therefore erred by failing to give the jury a unanimity instruction or special verdict form to establish that they unanimously agreed as to which of these alternative means had been proved. He next argues that his diagnosed antisocial personality disorder does not meet the definition of a "personality disorder." Finally, he argues there was insufficient evidence that he presently met the definition of an SVP. Because the State presented sufficient evidence that Dillingham presently had both a mental abnormality and a personality disorder, there was sufficient evidence to support the

jury's verdict on both alternative means, and the trial court did not err by not giving a unanimity instruction or a special verdict form. Accordingly, we affirm.

## FACTS

Dillingham was previously committed as an SVP in 2003 in Snohomish County Superior Court. His commitment was based in part on his 1985 conviction for indecent liberties against a child under 14, his 1989 convictions for three counts of indecent liberties and child molestation against two children, and his 1993 convictions for attempted indecent liberties by forcible compulsion and attempted first degree child molestation, both against a six-year-old girl.[1] His commitment was also based on his diagnoses of paraphilia-pedophilia and antisocial personality disorder.

Dillingham's SVP status was reviewed annually by the Department of Social and Health Services (DSHS), as required by RCW 71.09.070. Dillingham was annually informed of his right to petition the superior court for release. The annual evaluation reports were submitted to the court. Each year, the court conducted a show cause hearing, in which Dillingham and the State appeared through counsel, to determine whether Dillingham was entitled to a trial on whether he should be unconditionally released to a less-restrictive alternative.

---

[1] Between 1985 and 1993, Dillingham was convicted for (1) indecent liberties against a 22-year-old woman; (2) indecent liberties against a nine-year-old girl; (3) second degree rape against an adult woman incapable of consent; (4) communication with a minor for immoral purposes against a four-year-old girl; (5) indecent liberties against a four-year-old girl; (6) three counts of indecent liberties against a child and child molestation against an approximately four to six-year-old girl and an approximately six to eight-year-old boy; (7) communication with a minor for immoral purposes against a 14-year-old girl; and (8) attempted indecent liberties by forcible compulsion and attempted first degree child molestation against a six-year-old girl.

2

In 2010, Dillingham petitioned the superior court for release. Based on the expert opinion of Dr. Louis Rosell, the court concluded that Dillingham met his burden of producing prima facie evidence that his condition had changed to the extent that he no longer met the definition of a sexually violent predator. Dillingham was granted a new trial pursuant to RCW 71.09.090 to determine whether he continued to meet the statutory definition of an SVP.

At trial, psychologist John Hupka, Ph.D.,[2] testified about his interview of Dillingham, his review of Dillingham's records,[3] and tests he administered to Dillingham. He diagnosed Dillingham using the *Diagnostic and Statistical Manual* (DSM-IV-TR) definitions of mental disorders, the reference generally accepted in the discipline of psychology.

First, Dr. Hupka diagnosed Dillingham with pedophilia, which he defined as "sexual attraction to children."[4] He explained that Dillingham met all of the DSM-IV-TR criteria for pedophilia, including the facts that

> his sexual attraction to children has continued into his young adulthood. It's not just a passing fantasy with him. It's not just something that he engaged in once when he was drunk and never did it again. This is an ongoing pattern.
>
> . . . .

---

[2] After earning his Ph.D. in 1990, Dr. Hupka worked for the California Department of Corrections conducting psychological evaluations and assessments of potential parolees. Dr. Hupka estimated he had conducted approximately 800 evaluations or assessments of sex offenders since 1996, 700 or more of which were to determine whether they met statutory criteria for commitment as an SVP.

[3] Dr. Hupka described Dillingham's record as "voluminous," consisting of "thousands of pages of documents" including police reports of his prior offenses, probation officers' reports, prior mental health records and sex offender treatment records. Report of Proceedings (RP) (Dec. 1, 2011) at 236.

[4] Id. at 265.

Mr. Dillingham does fantasize about children, he does masturbate to those fantasies. More importantly in his case, he acts out repeatedly with sexual molestation of children, despite arrest and conviction and incarceration again and again.[5]

Second, Dr. Hupka diagnosed Dillingham with antisocial personality disorder. He testified that (1) Dillingham failed to conform to societal norms, as evidenced by his behavior and his history of arrests and parole violations; (2) Dillingham had "an element of deceitfulness about him," as evidenced by his refusal to acknowledge or discuss the details of his offenses, and claiming not to remember; (3) Dillingham was impulsive, "particularly in the realm of his sexual behavior. He has sex with two year olds, four year olds, seven year olds, 60 year olds. He's pretty indiscriminate about if he has an impulse, he'll go for it"[6]; (4) Dillingham "[c]learly . . . has disregard for the safety and rights of his victims. He gives little thought to how the rape of children would affect them"[7]; (5) Dillingham has "little remorse when it comes to his offenses," has "no conception of how his offense behaviors have affected his victims," and is "not particularly motivated or inclined to be interested in that"[8]; and (6) Dillingham failed to maintain consistent behavior or honor financial obligations, noting that he had little history of work and that his mother typically supported him when in the community. Dr. Hupka concluded Dillingham met the DSM-IV-TR definition because he "certainly has more than three" of the criteria, and is over 18 years old.[9] Dr. Hupka clarified that,

---

[5] Id. at 266, 268.

[6] Id. at 280.

[7] Id.

[8] Id. at 281.

[9] Id.

4

for Dillingham, "both his pedophilia and his antisocial personality disorder [are] chronic, lifelong conditions."[10]

Dr. Hupka testified that Dillingham's antisocial traits, such as selfishness and disregard of others, manifested in the offenses underlying his 1989 indecent liberties and child molestation convictions:

> He said that he knew that it wasn't okay to molest the children, but he said that it was a way of getting his sexual needs met and he was pretty much just thinking about himself. Wasn't thinking that it was hurting them.[11]

Dr. Hupka also testified that Dillingham did not cooperate with supervision, explaining that he "didn't register [as a sex offender] like he was supposed to" and "absconded supervision."[12] Dr. Hupka explained this was typical of someone who "lacks responsibility for their behavior."[13] Moreover, Dr. Hupka testified that Dillingham's test results were also consistent with his antisocial personality disorder diagnosis. Dr. Hupka described Dillingham's test result as a "spike 4," which indicated specific concerns:

> This is . . . typical with people who are selfish, don't have regard for other people's feelings. They tend to live by their own rules. They don't learn from their mistakes. . . .
>
>      . . . .
>
> Individuals who are antisocial and have a spike 4 profile tend to not be good candidates for treatment because—and since they live by their own rules they tend not to cooperate with supervision. The general rule, if

---

[10] Id. at 276.

[11] Id. at 251.

[12] Id. at 257.

[13] Id.

released in the community from prison, they typically abscond [from parole] or reoffend sooner or later and get back in custody.[14]

Third, Dr. Hupka diagnosed Dilligham with substance abuse. He testified that Dillingham's use of drugs and/or alcohol was closely linked to his offenses. Dillingham denied having had any contact with most of the victims, but admitted to Dr. Hupka that he "was always drunk or high on every one of my offenses."[15]

Special Commitment Center (SCC) psychologist Joe Mitrovich, Ph.D., testified about his work with Dillingham. Dr. Mitrovich testified that he was concerned that Dillingham's antisocial traits interfered with his ability to engage in the therapeutic process and increased Dillingham's risk of reoffending:

> [Dillingham] continued to . . . manifest some very antisocial thinking, [including] referring to the residential staff as police, [displaying] victim stance type mentality, which is one of those thinking barriers . . . indicative of criminal type thinking, you know, I wasn't wrong in the situation, it was the other person type thinking.[16]

He testified that Dillingham showed a "general lack of transparency" about his relationship with a woman while in DSHS custody, especially since the woman had children.[17] This was concerning, because it showed a "lack of insight into . . . a pretty significant risk factor" for reoffending if he was released.[18] Dr. Mitrovich explained that Dillingham's unwillingness to participate fully in counseling increased the likelihood he would reoffend:

---

[14] Id. at 240.

[15] Id. at 244.

[16] RP (Nov. 30, 2011) at 165.

[17] Id. at 173.

[18] Id. at 174.

6

> [H]aving an understanding of the treatment concept such as risk factors, and in particular what's referred to as dynamic risk factors, which are a set of things that have been identified in the research in this area, like . . . sexual preoccupation, sexual coping, deviant sexual interest, sexual entitlement, child molester attitudes . . . . [T]he essence of treatment is having an understanding of those and being able to recognize how they have manifested in your life, how they contributed to you engaging in the act of offending, to understand the distortions that are related to those risk factors, and then . . . just having the ability to have insight into those, recognize them when they start coming up, and having the ability to effectively intervene once they're recognized.
>
> And so if someone is developing a relationship like it seemed he was and isn't talking about it, isn't recognizing how it could be a risk factor for him, isn't doing those things, it seems like, like I said, there is a lack of insight or just ignoring of what could be a risk factor.[19]

Dr. Mitrovich explained that Dillingham's refusal to cooperate with supervision "is a risk factor that's been identified in the literature as having a strong correlation with recidivism."[20] When asked what Dillingham would need to work on in treatment, Dr. Mitrovich identified the following:

> You know, there is a set of risk factors for him, namely being negative emotionality, hostility, the lack of cooperation with supervision, the lack of concern for others. . . . the lack of transparency we've talked about, those are all areas that need to be improved for Mr. Dillingham.[21]

Dillingham testified about antisocial personality disorder. The prosecutor asked, "Do you believe that you suffer from antisocial personality disorder?"[22] Dillingham answered, "I can't say that I do or I don't. I do have I guess you can say some traits of antisocial personality disorder."[23] The prosecutor then asked, "But you agree you've

---

[19] Id. at 174-75.

[20] Id. at 176.

[21] Id. at 177.

[22] Id. at 104.

[23] Id.

been diagnosed with antisocial personality disorder throughout your life?"[24] Dillingham answered, "I agree that I have been, yes, by psychologists."[25]

Dillingham also testified that he had substance abuse issues, and described the relationship between his substance abuse and his acts of sexual violence. He testified that his substance abuse has "gradually gotten worse and worse throughout my life."[26] Dillingham revealed that drinking and using drugs was part of a pattern when he repeatedly committed indecent liberties and child molestation against two young children left in his care many times over an extended period. In fact, he testified that he was under the influence of drugs or alcohol "[e]very time I offended."[27] He testified that in 1985, he committed a sexual assault against his brother's wife after "drinking and doing drugs with my friends."[28] He also acknowledged that after drinking with friends, he committed acts against a 16-year-old girl that led to him being charged with rape.

Before closing arguments, defense counsel proposed a special verdict form requiring the jury to answer whether they specifically found that the State proved a mental abnormality and whether they specifically found the State proved a personality disorder. The State opposed the court providing a special verdict form.

Following trial, the jury determined that Dillingham is a sexually violent predator, pursuant to RCW 71.09.060. The trial court ordered him committed to the custody of DSHS.

---

[24] Id.

[25] Id.

[26] Id. at 110.

[27] Id. at 148.

[28] Id. at 114.

Dillingham appeals.

ANALYSIS

Dillingham raises three related arguments in this appeal. First, he contends there was insufficient evidence that he had both a mental abnormality and a personality disorder and no special verdict was given requiring juror unanimity as to which of these alternative means the jury found established. Second, he argues there was evidence of multiple distinguishable conditions that could establish a mental abnormality and he was entitled to a jury instruction requiring unanimity as to which the jury found proved. Third, he asserts there was insufficient evidence that he continued to have a mental illness. None of his arguments establish that he is entitled to appellate relief.

*Alternative Means*

While SVP involuntary commitment proceedings are civil in nature, a defendant in such proceedings is entitled to due process protections that include a unanimous jury verdict.[29] Chapter 71.09 RCW allows indefinite commitment as an SVP where the jury finds beyond a reasonable doubt that the person has been convicted of a crime of sexual violence and "suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility."[30] "Mental abnormality" is defined as:

> [A] congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to the commission of criminal

---

[29] RCW 71.09.060(1); see also In re Detention of Halgren, 156 Wn.2d 795, 807-08, 132 P.3d 714 (2006); In re Pers. Restraint of Young, 122 Wn.2d 1, 48, 857 P.2d 989 (1993).

[30] RCW 71.09.020(18).

sexual acts in a degree constituting such person a menace to the health and safety of others.[31]

"Personality disorder" is defined as:

[A]n enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has onset in adolescence or early adulthood, is stable over time and leads to distress or impairment.[32]

These definitions were provided in the court's jury instructions.

Dillingham is correct that a personality disorder and a mental abnormality are two alternative means of establishing the mental illness element of an SVP commitment determination.[33] However, these alternative means "may operate independently or may work in conjunction."[34] And "because an SVP may suffer from both defects simultaneously, the mental illnesses are not repugnant to each other and may inhere in the same transaction."[35] Accordingly, where there is substantial evidence that a defendant has both a mental abnormality and a personality disorder, the trial court does not violate the constitutional right to unanimity by failing to instruct the jury that it must reach unanimous agreement as to which condition it found satisfied that element.[36] Put differently:

Where an element may be established by alternative means, a particularized expression of unanimity as to the means relied upon to

---

[31] RCW 71.09.020(8).

[32] RCW 71.09.020(9).

[33] See In re Detention of Halgren, 156 Wn.2d 795, 811, 132 P.3d 714 (2006); In re Detention of Pouncy, 144 Wn. App. 609, 618, 184 P.3d 651 (2008).

[34] Halgren, 156 Wn.2d at 810.

[35] Id.

[36] Id. at 811-12.

reach the verdict is not required so long as there is substantial evidence to support a verdict on each alternative.[37]

The substantial evidence test is satisfied if this court is convinced that "a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt."[38] In reviewing a record for substantial evidence, this court will not second guess the credibility determinations of the jury.[39]

This court's opinion in In re Detention of Ticeson is pertinent to our review.[40] Ticeson conceded the State presented sufficient evidence to prove that he suffered from a mental abnormality and a personality disorder, but argued that the State failed to present evidence sufficient to prove this personality disorder made him likely to reoffend.[41] This court concluded that the State's expert witness's testimony that "Ticeson's personality disorder causes him serious difficulty controlling his sexually violent behavior" was "sufficient to allow a rational juror to find Ticeson's personality disorder makes him likely to reoffend," and thus adequately supported the verdict.[42]

Like Ticeson, Dillingham does not contend there was insufficient evidence that he has a mental abnormality that predisposes him to acts of sexual violence. Dr.

---

[37] In re Detention of Ticeson, 159 Wn. App. 374, 388-89, 246 P.3d 550 (2011) (citing Halgren, 156 Wn.2d at 809).

[38] State v. Kitchen, 110 Wn.2d 403, 410-11, 756 P.2d 105 (1988) (emphasis omitted).

[39] State v. Jeannotte, 133 Wn.2d 847, 853-54, 947 P.2d 1192 (1997) (quoting State v. Snider, 70 Wn.2d 326, 327, 422 P.2d 816 (1967)).

[40] 159 Wn. App. 374, 246 P.3d 550 (2011).

[41] Id. at 388.

[42] Id. at 388-89.

Hupka's testimony amply supports the conclusion that Dillingham's pedophilia predisposed him to commit acts of sexual violence.

As was true in Ticeson, Dillingham's argument that there was insufficient evidence that his personality disorder made him more likely to commit acts of sexual violence fails. Like the State's expert witness in Ticeson, Dr. Hupka testified that Dillingham's antisocial personality disorder increased the risk that he would commit more acts of sexual violence. He testified that the combination of these conditions presented a high risk:

> I do believe he's an antisocial personality disordered man, but that's not the whole story. He's also a sexually deviant man . . . . I think the particular problem with him is that you have the combination of sexual deviance, that is, the attraction to children and the desire for coercive sex that he's shown.
>
> So he has this sexual deviance, and because of the antisocial personality disorder, he's not the least bit motivated to change that sexual deviance. . . . That's a formidable combination.[43]

Dr. Hupka also explained that Dillingham's substance abuse was another risk factor that raised the likelihood that he would reoffend. The evidence at trial amply demonstrated that substance abuse was nearly always a feature in Dillingham's attacks, that his antisocial traits, such as selfishness, disregard for others, impulsiveness and lack of remorse were integral to his commission of sexually violent acts.

The trial record contains substantial evidence from which the jury could have found that Dillingham's antisocial personality disorder or substance abuse made him more likely to engage in predatory acts of sexual violence if not confined. There is no

---

[43] RP (Dec. 1, 2011) at 284-85.

requirement that the State prove that the antisocial personality disorder or substance abuse, standing alone, makes Dillingham likely to reoffend.[44] Dillingham provides no authority to support his argument that all of his diagnoses must be considered without regard to one another, as if in a vacuum. Such a conclusion would be contrary to our Supreme Court's recognition that the various mental abnormalities and personality disorders in a given case "may work in conjunction" to make one more likely to reoffend.[45]

To the extent Dillingham argues that the State's closing argument deprived him of a unanimous verdict, his argument is not persuasive. The State did not expressly or impliedly argue that each of the two mental abnormalities (pedophilia and substance abuse) or the personality disorder (antisocial personality disorder), standing alone, established his status as an SVP. In addition, the jury was instructed that "the lawyers' remarks, statements, and arguments are not evidence. You should disregard any remark, statement, or argument that is not supported by the evidence or the law as I have explained it to you.[46] Juries are presumed to follow the court's instructions.[47]

Dillingham's argument that the antisocial personality disorder diagnosis did not meet the definition of "personality disorder" because it was not "enduring, pervasive, inflexible and stable over time" is not persuasive.[48] Dr. Hupka testified that Dillingham's

---

[44] See Halgren, 156 Wn.2d at 807-11.

[45] Id. at 810.

[46] Clerk's Papers at 7.

[47] State v. Foster, 135 Wn.2d 441, 472, 957 P.2d 712 (1998).

[48] Appellant's Br. at 19.

antisocial personality disorder was a "chronic or lifelong condition[ ]."[49] This evidence directly supports a reasonable conclusion that Dillingham's antisocial personality disorder was stable and enduring.

There was sufficient evidence presented at trial to support the jury's verdict under both alternative means in the SVP statute.

*Means within a Means*

Dillingham contends he was entitled to a jury instruction requiring juror unanimity as to whether it found that the mental abnormality of substance abuse or pedophilia was proved. This issue is controlled by In re Detention of Sease.[50] In that case, the State presented evidence that Sease had both borderline personality disorder and antisocial personality disorder.[51] Sease argued it was error to not provide a unanimity instruction since the State offered multiple diagnoses. Division Two of this court rejected the argument, concluding that

> the jury here need only have unanimously found that the State proved that Sease suffered from a personality disorder that made it more likely that he would engage in acts of sexual violence if not confined to a secure facility. The jury need not have unanimously decided whether Sease suffered from borderline personality disorder or antisocial personality disorder. Therefore, the trial court did not err in failing to give a unanimity instruction.[52]

---

[49] RP (Dec. 1, 2011) at 276.

[50] 149 Wn. App. 66, 201 P.3d 1078 (2009).

[51] Id. at 71-72.

[52] Id. at 78-79. "[W]here a disputed instruction involves alternatives that may be characterized as a 'means within [a] means,' the constitutional right to a unanimous jury verdict is not implicated and the alternative means doctrine does not apply." Id. at 77 (alteration in original) (internal quotation marks omitted) (quoting State v. Smith, 159 Wn.2d 778, 783, 154 P.3d 873 (2007)).

We disagree with Dillingham's argument that <u>Sease</u> was wrongly decided. We agree with the analysis in <u>Sease</u>, and conclude that the State was not required to prove which mental abnormality, substance abuse or pedophilia, it determined satisfied this element. No unanimity instruction was required.

*Continuing Mental Illness*

Dillingham asserts there was insufficient evidence that he continued to have a mental illness. We conclude that, to the contrary, the evidence at trial was sufficient to support the jury's verdict. In particular, Dr. Hupka described the pedophilia and antisocial personality disorders as chronic, and Dillingham himself testified that his substance abuse had worsened over time. Dr. Hupka also explained that any remission in Dillingham's overt symptoms were in large part attributable to his confinement.[53] There was no error.

Affirmed.

WE CONCUR:

---

[53] "Often antisocial fellows, when they're in prison, they do quite a bit better than when they're in the community because they have an external structure." RP (Dec. 1, 2011) at 282. "I would say it's more typical[ ] that individuals do not reoffend in custody. Two reasons: One, there is no children there. He doesn't have the opportunity. And two, he has the structure of the institution . . . . Guards, staff members around, barbed wire, can't go anywhere. That kind of containment, it's an external containment that supplies a structure that he lacks within." <u>Id.</u> at 292.