**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73553-5-I |
| Respondent, | ) | DIVISION ONE |
| v. | ) | |
| MAXIMO BERNAL-ROSAS, | ) | UNPUBLISHED |
| Appellant. | ) | FILED: September 26, 2016 |

COX, J. – A jury found Maximo Bernal-Rosas guilty of attempting to elude a pursuing police vehicle and driving under the influence. On appeal, he contends that the trial court violated his public trial rights by conducting a sidebar to address defense counsel's objection during closing argument. But the challenged sidebar was analogous to those addressed by our supreme court in State v. Smith,[1] and Bernal-Rosas has failed to demonstrate that the sidebar implicated public trial rights. Because there was no public trial violation, we affirm.

The state of Washington charged Bernal-Rosas with attempting to elude a pursuing police vehicle, taking a motor vehicle without permission in the second degree, and driving while under the influence (DUI) following an incident in which he drove off in a police vehicle and crashed into a tree.

At trial, Earl Steele testified that at about 11:00 a.m. on December 25, 2013, he heard someone knocking on the door of his Burlington residence.

_____

[1] 181 Wn.2d 508, 334 P.3d 1049 (2014).

When Steele opened the door, a man later identified as Bernal-Rosas said that he had been tied up in his house with his wife and kids and that he had escaped. Steele let the man inside and called 911. Steele reported that a "distressed" and possibly injured man had appeared at his house.

Skagit County Sherriff's Deputy Jason Moses responded to the 911 call. After arriving at Steele's house, Moses spoke to Bernal-Rosas, who appeared "paranoid [and] fidgety" and was moving constantly. Bernal-Rosas repeatedly told Moses that he had been tied up and mentioned witches and black magic. Moses also smelled the odor of alcohol on Bernal-Rosas, who acknowledged he had "a lot" to drink. At some point, Bernal-Rosas' wife and uncle arrived at the house and spoke with Moses.

Meliton Bernal, Bernal-Rosas' uncle, testified that Bernal-Rosas started drinking on the afternoon of Christmas Eve and continued drinking during an evening party. In the early morning hours of Christmas Day, Bernal-Rosas suddenly became scared and started acting abnormally. After Bernal-Rosas kicked a hole in a door and broke a lamp, Bernal and Bernal-Rosas' wife tied his hands and feet. At around 5:00 a.m., Bernal-Rosas was able to free himself and leave the house. Bernal did not see Bernal-Rosas again until he appeared at Steele's house.

After a second deputy arrived at Steele's house, Moses placed Bernal-Rosas into the back seat of his patrol car. Moses told Bernal-Rosas that he was

-2-

not under arrest and was not going to jail. Bernal-Rosas asked to be taken to jail. Moses eventually decided to transport Bernal-Rosas to a hospital for a mental evaluation.

After about 15 minutes in the patrol car, Bernal-Rosas managed to crawl into the front seat. Moses, who stood nearby speaking with Bernal-Rosas' relatives, heard his patrol car shift into gear. Moses then saw "the bumper drop suddenly, as if it was high acceleration," and Bernal-Rosas drove off. During the ensuing chase, Washington State Patrol Trooper Anthony Pasternak pursued Bernal-Rosas at speeds up to 95 mph in a 35 mph zone.

Bernal-Rosas eventually lost control of the car during a turn, plowed through a picket fence, and crashed into a tree, causing a small car fire. Pasternak pulled Bernal-Rosas out of the car and, with some difficulty, handcuffed him. After turning Bernal-Rosas over to the sheriff's deputies, Pasternak put out the car fire.

Bernal-Rosas continued to struggle and thrash around as the officers attempted to restrain him. At one point, Bernal-Rosas began "gurgling and grunting and making some very abnormal noises," raising concerns that he was having a seizure. Bernal-Rosas calmed down after officers restrained him on a backboard for transport to the hospital.

After Pasternak observed Bernal-Rosas at the hospital and conducted a horizontal gaze nystagmus test, he concluded that Bernal-Rosas was impaired

from the consumption of alcohol. A test of Bernal-Rosas' blood showed an alcohol level of .084 at the time of the draw. The State's forensic toxicologist estimated that based on the appropriate "burnoff rate," Bernal-Rosas would have consumed 25 standard drinks during the preceding 22 hours to reach that alcohol level.

Doctors at the hospital admitted Bernal-Rosas after determining that his symptoms, including mental confusion, were consistent with sepsis arising from an infection. After reviewing Bernal-Rosas' medical record, Dr. Anthony Eusanio, a psychologist, testified that at the time of the crash, Bernal-Rosas was suffering from sepsis-related delirium resulting from an upper-respiratory infection and fever. Dr. Eusanio concluded that the delirium, which was exacerbated by alcohol consumption, prevented Bernal-Rosas from understanding right from wrong at the time he drove off in the patrol car.

Bernal-Rosas testified that he did not remember very much about the charged incidents. He maintained that he had not consumed enough alcohol on Christmas Eve to become drunk. He claimed he initially felt "normal" after returning from the Christmas Eve party. At some point, however, there was a "change," and he recalled becoming nervous and afraid of his wife and uncle. He felt that a witch had cast "evil spirits" on his relatives. At some point, Bernal-Rosas ran to a neighbor's house to ask for help because his family had been kidnapped.

Bernal-Rosas also recalled becoming increasingly anxious and desperate while he was sitting in the patrol car. Bernal-Rosas felt he needed to escape and eventually crawled through a small window into the front seat. After removing the ammunition from the guns in the front seat, Bernal-Rosas drove off, hoping to reach the house of a different uncle.

The trial court instructed the jury on the defense of not guilty by reason of insanity. The jury found Bernal-Rosas not guilty by reason of insanity of the taking charge, but guilty as charged of attempting to elude and DUI. The court sentenced Bernal-Rosas to 3 months in jail on the attempting to elude count and 364 days on the DUI count, with 363 days suspended.

## PUBLIC TRIAL

Bernal-Rosas contends the trial court violated his right to a public trial when it conducted a sidebar conference following defense counsel's objection during closing argument. Bernal-Rosas' primary defense to the charged offenses was temporary insanity resulting from a sepsis-associated delirium. The trial court instructed the jury that Bernal-Rosas bore the burden of proving the defense of insanity by a preponderance of the evidence.

During closing argument, the prosecutor first discussed at length the evidence supporting the State's case. The prosecutor then commented on Bernal-Rosas' defense:

> [Prosecutor]: That's when it comes to the preponderance of evidence. Did they convince you that it's more likely true than not that the alcohol -- or the sepsis was the cause of these deliriums?

-5-

Or was it the alcohol, which was reaching its highest level, and compute -- and you can compute it back to what it would have been, about that time, using those figures that we gave you. It was that's what was causing this defendant to go off the rails. That's their burden, to show you that that happened.

[Defense counsel]: Objection.

THE COURT: Approach.

(BENCH CONFERENCE OFF THE RECORD.)

[Prosecutor]: Just to be clear, the state is not saying that -- that the defense has the burden of proof on anything, other than when they claim insanity, they have the burden of proof preponderance of the evidence. And if I -- if their testimony is that it was caused by sepsis, then they have to prove that. We think what the -- the evidence shows that it is the alcohol. That's all.

So in closing, we have to prove beyond a reasonable doubt that this car was stolen, and I went through the elements, and I think we've done that. We have to prove that this car was driven while he was -- the defendant was under the influence, and I believe we've shown, the state -- we believe the evidence shows that he was.[2]

Bernal-Rosas claims that because the sidebar was unrecorded and unmemorialized, it implicated his public trial rights and therefore constituted an unjustified closure of the proceedings. We disagree.

Both the state and federal constitutions guarantee a defendant the right to a public trial.[3] In general, the right to a public trial requires that trial proceedings be held in open court unless the trial court finds that a closure of the courtroom is

---

[2] Report of Proceedings (January 16, 2015) at 29-31.
[3] See State v. Wise, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012); Wash. Const. art. I, § 22; U.S. CONST. amend. VI.

justified after considering the five-factor test set forth in State v. Bone-Club.[4] An

alleged violation of the right to a public trial is a question of law that we review de

novo.[5]

Our supreme court has adopted a three-step framework for analyzing

alleged violations of the public trial right:

> First, we ask if the public trial right attaches to the proceeding at
> issue. Second, if the right attaches we ask if the courtroom was
> closed. And, third, we ask if the closure was justified.[6]

"But not every interaction between the court, counsel, and defendants will

implicate the right to a public trial or constitute a closure if closed to the public."[7]

In determining whether a proceeding implicates the public trial right, courts utilize

the two-part "experience and logic" test.[8] The experience prong "asks 'whether

the place and process have historically been open to the press and general

public.'"[9] The logic prong "asks 'whether public access plays a significant

positive role in the functioning of the particular process in question.'"[10] Only if

both questions are answered in the affirmative is the public trial right implicated.[11]

---

[4] 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995).
[5] State v. Sublett, 176 Wn.2d 58, 70, 292 P.3d 715 (2012).
[6] State v. Love, 183 Wn.2d 598, 605, 354 P.3d 841 (2015) (citing State v. Smith, 181 Wn.2d 508, 513-14, 334 P.3d 1049 (2014)).
[7] Sublett, 176 Wn.2d at 71.
[8] Id. at 72-75.
[9] Id. at 73 (quoting Press–Enterprise Co. v. Superior Court, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)).
[10] Id. (quoting Press-Enterprise Co., 478 U.S. at 8).
[11] Id.

The defendant bears the burden of demonstrating that the challenged process implicates the public trial right.[12]

In State v. Smith,[13] the defendant argued that multiple sidebar discussions following evidentiary objections during trial violated his public trial rights. After applying the experience and logic test, our supreme court concluded that "reasonable and traditional sidebars used to avoid interruption of a trial do not implicate the public trial right."[14]

In analyzing the experience prong, the Smith court noted that sidebar conferences have historically occurred outside the view of the public.[15] The court stressed the "practical difficulties" that would result from extending public trial jurisprudence to sidebar conferences on evidence without any resulting public benefit:

> In the case of sidebar discussions, issues arising with the jury present would always require interrupting trial to send the jury to the jury room, often located some distance from the courtroom, thereby occasioning long delays every time the court wishes to caution counsel or hear more than a simple "objection, Your Honor." This would do nothing to make the trial more fair, to foster public trust, or to serve as a check on judges by way of public scrutiny.[16]

---

[12] Love, 183 Wn.2d at 605.
[13] Smith, 181 Wn.2d 508, 334 P.3d 1049 (2014).
[14] Id. at 521.
[15] Id. at 515.
[16] Id. (quoting In re Detention of Ticeson, 159 Wn. App. 374, 386 n.38, 246 P.3d 550 (2011)).

The Smith court also concluded that the logic prong weighed against implicating a public trial right. The court again explained the problems associated with "forcing the jury in and out of the courtroom repeatedly whenever an objection is made."[17] The court further concluded that, more importantly, evidentiary rulings during traditional sidebars "do not invoke any of the concerns the public trial right is meant to address regarding perjury, transparency, or the appearance of fairness."[18]

Although Smith involved only evidentiary sidebars during trial, the court recognized that the analysis could apply to other traditional sidebars:

> We caution that merely characterizing something as a "sidebar" does not make it so. To avoid implicating the public trial right, sidebars must be limited in content to their traditional subject areas, should be done only to avoid disrupting the flow of trial, and must either be on the record or be promptly memorialized in the record.[19]

The sidebar at issue here appears only to have addressed a single speaking objection during closing argument. Defense counsel's objection was clearly directed to the prosecutor's comments on burden of proof, a common subject of objections during closing argument. Such objections routinely require the trial court to resolve legal, evidentiary, and instructional issues. The "practical difficulties"[20] in managing juries during evidentiary sidebars apply

---

[17] Id. at 518.
[18] Id.
[19] Id. at 516 n.10.
[20] Id. at 516.

equally to sidebars during closing arguments that are frequently contentious in light of the parties' wide latitude to draw inferences from the evidence. Nothing in the record suggest that the sidebar here was anything other than a brief interruption, intended to avoid disrupting the flow of the parties' arguments as much as possible.

Bernal-Rosas contends the sidebar violated his public trial rights because the discussion was not recorded or contemporaneously memorialized. The Smith court explained that recording or memorializing the discussion is a key factor in determining whether a sidebar implicates the public trial right. Placing sidebar discussions on the record not only permits the public to determine precisely what happened during the sidebar, but also serves to negate any concern about secrecy.[21]

As Bernal-Rosas acknowledges, however, the record clearly shows that defense counsel's objection was specifically directed to the prosecutor's reference to the burden of proof. After the brief sidebar, the prosecutor resumed closing argument by immediately referring to the prior comment that had triggered the objection and clarifying both the nature and scope of the State's burden of proof and the defense's burden of proof on the insanity defense. Defense counsel raised no further objection. So we must assume that the prosecutor fully complied with the court's decision made during the sidebar.

---

[21] Id. at 518.

The record indicates the trial court recognized the prosecutor's reference to burden of proof might not be completely clear and acted quickly to direct the prosecutor to negate any potential confusion. On this record, the nature of defense counsel's objection and the trial court's resolution of the objection are clear. Neither recording nor memorialization of the side bar was necessary to avoid the "concerns the public trial right is meant to address regarding perjury, transparency, or the appearance of fairness."[22]

Bernal-Rosas also contends that the experience and logic test implicated his public trial rights because defense counsel's objection involved "flagrant" prosecutorial misconduct. He argues that objections involving such misconduct raise concerns about fairness and the appearance of fairness in criminal trials that cannot be resolved in secret. But Bernal-Rosas cites no relevant authority to support such an analysis. More importantly, although the prosecutor's reference to the burden of proof was possibly confusing, Bernal-Rosas has failed to identify anything in the record suggesting flagrant misconduct. And we see no such misconduct in our careful review of the record. Nor has he demonstrated that the routine sidebar during closing argument here was fundamentally different than sidebars involving evidentiary objections.

We conclude that the challenged sidebar conference was analogous to the evidentiary sidebars in <u>Smith</u>. The <u>Smith</u> analysis is therefore controlling,

---

[22] <u>Id.</u>

and the single sidebar during closing did not implicate Bernal-Rosas' public trial rights. Because the sidebar did not implicate Bernal-Rosas' public trial rights, we need not address whether there was a closure or whether any closure was justified.[23]

We affirm the judgment and sentence.          Cox, J.

WE CONCUR:

Leach, J.          Becker, J.

_____

[23] Id. at 519 (if the court determines that a process does not implicate the public trial right, it need not address the remaining steps of the analytical framework).