IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

IN RE THE DETENTION OF:          )
ROLANDO REYES.                   )          No. 28167-1-III
                                 )
                                 )
                                 )
                                 )
                                 )          OPINION PUBLISHED IN PART
                                 )

KORSMO, C.J. — Does a litigant have standing to assert the public's right to attend a motion hearing in a civil case where he did not assert his own right to do so? This appeal from a sexually violent predator determination requires us to face this question and others concerning the meaning and scope of art. I, § 10 of our state constitution. We conclude that the provision creates a right of public access to the courts that can be asserted by a litigant in his own behalf, but may not be asserted by the litigant on behalf of others (the public). We affirm the bench verdict.

## BACKGROUND[1]

While appellant Rolando Reyes was imprisoned for residential burglary, the Attorney General petitioned in 2004 to commit Mr. Reyes to the Special Commitment Center (SCC) to await trial as a sexually violent predator (SVP). The petition was

---

[1] The facts and procedure relating to the public trial question are discussed in this section, while the factual matters relating to the trial are discussed in the unpublished portion of this opinion in conjunction with the analysis of the trial issue.

dropped after he was convicted of twice committing custodial assault with sexual motivation while at the SCC.

The petition was refiled in 2008 when his 36-month sentence for the two custodial assault convictions was ending. He moved to dismiss, arguing that the Attorney General lacked authority to bring the petition and that it should not have been filed in Benton County. The motion was heard by telephone, with the Assistant Attorney General appearing from her office in Seattle. The record reflects that the judge, two attorneys representing Mr. Reyes (one of whom was then serving as guardian ad litem), and a court reporter were present in chambers for the motion hearing.[2] After hearing argument, the court denied the motion to dismiss. Counsel for Mr. Reyes indicated that they had a signed jury trial waiver on hand and asked for the State's telephonic approval of the waiver. Counsel for the State noted that she had filed the jury demand and advised the court that she would withdraw it at that time. The court accepted the withdrawal.

Bench trial began nine days later with the initial focus on whether a guardian was still needed. That hearing then segued into the commitment trial itself. At the conclusion of trial, the judge found that Mr. Reyes was a sexually violent predator and ordered him committed to the SCC.

---

[2] It is unclear from the record whether Mr. Reyes was present, although there is no reference to him at the hearing.

2

Mr. Reyes timely appealed to this court. His brief challenged the sufficiency of the evidence to support the SVP determination and the "closure" of the courtroom at the pretrial hearing on his motion to dismiss. This court stayed the appeal pending the outcome of *State v. Wise*, 176 Wn.2d 1, 288 P.3d 1113 (2012). After the mandate issued in *Wise*, this court requested supplemental briefing from the parties and then heard oral argument.

## ANALYSIS

We first consider Mr. Reyes's argument that hearing the pretrial motion in the court's chambers constituted a courtroom closure in violation of art. I, § 10 of the Washington Constitution. His evidentiary sufficiency claim will be addressed in the unpublished portion of this opinion.

The closure argument requires us to address the history of art. I, § 10 to ascertain its meaning and application to this civil case. That inquiry looks at the language chosen by our constitution's framers and its historical antecedents, as well as interpretation of that provision over the years.[3] We then consider the meaning of the provision in light of this history before turning to the question of standing.

---

[3] To save space this historical review addresses solely Washington Supreme Court decisions relating to § 10 and § 22. We are quite aware of the United States Supreme Court decisions involving First and Sixth Amendments access to the courts, and the numerous well-reasoned opinions of the Court of Appeals applying the Washington

3

*Language and Historical Antecedents*

Art. I, § 10 was adopted during our 1889 constitutional convention and approved by the voters later that year. Then, as now, the provision read:

> **§ 10 ADMINISTRATION OF JUSTICE.** Justice in all cases shall be administered openly, and without unnecessary delay.

This provision is found in the first article of our constitution, the Declaration of Rights.

Also found in that article is § 22, Rights of the Accused. In part, that provision states:

> **§ 22 RIGHTS OF THE ACCUSED.** In criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed . . . .

The noted language of this provision also was enacted in 1889 and was not changed when the provision was amended in 1922 to include a venue provision for offenses committed in transit. *See* Amendment 10, 1921 p. 79 § 1.

There currently are 35 sections to Article I, which is the first of what currently are 32 articles in the constitution. The provisions of Article I detail individual rights, limitations on government power, and the people's political authority including the right to recall officials. The very first section declares:

> **§ 1 POLITICAL POWER.** All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights.

---

constitutional provisions, but only a few of the most factually relevant of these cases will be addressed later in this opinion. Enough trees will die as is.

The constitution's remaining articles address the branches of government and varying topics from elections and education to compensation of state and public officers. Article XXXI, which guarantees equality for the sexes, is the only other article to address the rights of individuals.

The framers drew upon the constitutions of Indiana and Oregon for the text of art. I, § 10. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, at 499 n.18 (Beverly Paulik Rosenow, ed., 1962) (hereinafter Rosenow). Washington considered, but rejected, en toto adoption of Oregon's provision. It read:

> No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation.

OR. CONST. art. I, § 10 (1857); Rosenow, p. 499. The Oregon Constitution was the first to require that "justice be administered openly," a phrase that Washington adopted in art. I, § 10 as "Justice in all cases shall be administered openly."[4] There is no Oregon constitutional history that explains the change from "open courts" to the open administration of justice. Claudia Burrton and Andrew Grade, *A Legislative History of*

---

[4] The Arizona Constitution subsequently adopted Washington's art. I, § 10 verbatim. *See* ARIZ. CONST. art. 2, § 11 (1912).

5

*Oregon's Constitution of 1857–Part I (Articles I & II)*, 37 WILLAMETTE L. REV. 469, 516 (2001).

The Oregon provision, in turn, was modeled after Indiana's 1851 Constitution. *Oregonian Pub. Co. v. O'Leary*, 303 Or. 297, 302 n.3, 736 P.2d 173 (1987) ("Nearly identical language found its way into Article I, section 12, of the Indiana Constitution of 1851, on which Article I, section 10, of the Oregon Constitution was based.") (citing Palmer, *The Sources of the Oregon Constitution*, 5 OR. L. REV. 200, 201 (1926)).

The Indiana provision had read:

> All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.

IND. CONST. art. I, § 12 (1851).

It is possible to trace the "open courts" language to the early English common law following the Magna Carta. The 1851 Indiana provision is nearly identical to that found in the 1816 Indiana Constitution.[5] Indiana's 1816 Constitution was in turn based on the constitutions of Ohio, Kentucky, Pennsylvania, and Tennessee. John D. Barnhart, *Sources of Indiana's First Constitution*, 39 IND. MAG. OF HIST. 55, 55 (Issue 1, 1943).

---

[5] "That all Courts shall be open, and every person, for an injury done him, in his lands, goods, person, or reputation shall have remedy by the due course of law; and right and justice administered without denial or delay." IND. CONST. art. I, § 11 (1816).

6

Indiana's 1816 open courts provision is an exact copy of Ohio's 1802 provision. OH. CONST. art. VIII, § 7 (1802).[6] It also is almost indistinguishable from the constitutions of Kentucky[7] and Tennessee[8] that were in effect at that time. The only difference is that Kentucky and Tennessee included the word "purchase" in front of the phrase "denial or delay."

The Ohio, Kentucky, and Tennessee Constitutions had their foundation in Pennsylvania's Constitutions of 1776 and 1790. *See State v. Wyant*, 68 Ohio St. 3d 162, 168, 624 N.E.2d 722 (1994); William C. Koch Jr., *Reopening Tennessee's Open Courts Clause*, 27 U. MEM. L. REV. 333, 368, 386 (1997). Most constitutions in the late 18th century were patterned on Pennsylvania's and Massachusetts's. Koch at 368. The former contained an open courts provision, while the latter did not. *Id.*

Pennsylvania's original open courts provision read:

Courts of sessions, common pleas, and orphans courts shall be held quarterly in each city and county; and the legislature shall have power to establish all such other courts as they may judge for the good of the inhabitants of the state. **All courts shall be open, and justice shall be impartially administered without corruption or unnecessary delay**: All their officers shall be paid an adequate but moderate compensation for their services: And if any officer shall take greater or other fees than the law allows him, either directly or indirectly, it shall ever after disqualify him from holding any office in this state.

---

[6] This is currently found as amended in art. I, § 16 of the Ohio Constitution.
[7] KY. CONST. art. X § 13 (1799).
[8] TENN. CONST. art. XI § 17 (1796).

PA. CONST. § 26 (1776) (emphasis added).

Prior to statehood, Pennsylvania had a history of constitutionalism dating back to William Penn's founding of the colony in the 1600s. Article V of Penn's Laws Agreed Upon in England read: "That all courts shall be open, and justice shall neither be sold, denied nor delayed." William Penn's 1682 Pennsylvania Charter of Liberty, Laws Agreed Upon in England, etc.

Most cases and law review articles cite Penn's Laws Agreed Upon in England as America's first open courts provision. This is likely because it is the first American document to state that "justice shall neither be sold, denied nor delayed." This language in turn has its origin in Chapter 40 of Magna Carta (1215), which read: "To no one will we sell, to no one will we deny or delay right or justice." Notably, the Magna Carta does not use the word "open."

Article V of Penn's Laws Agreed Upon in England actually appears to be a philosophical refinement on an earlier American document of which Penn was also a principal architect—the 1677 Concessions and Agreements of West New Jersey. Chapter XXIII of the 1677 Concessions and Agreements of West New Jersey stated:

> "That in all publick courts of justice for tryals of causes, civil or criminal, any person or persons, inhabitants of the said Province may freely come into, and attend the said courts, and hear and be present, at all or any such tryals as shall be

8

there had or passed, that justice may not be done in a corner nor in any covert manner."

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 567, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980) (quoting 1677 Concessions and Agreements of West New Jersey, Ch. XXIII (reprinted in Sources of Our Liberties 188 (R. Perry ed. 1959))). This is the earliest and clearest endorsement of open courts in America. It also specifies that both civil and criminal trials are open to the public.

William Penn's legal philosophy was heavily influenced by Edward Coke and his commentaries on Magna Carta and other English laws. Koch at 364. It is in Coke's writings that the open courts provision has been traced to its earliest point. Coke's commentary on the first chapter of the 1267 Statute of Marlborough read:

> These words are of great importance, for all Causes ought to be heard, ordered, and determined before the Judges of the Kings Courts openly in the Kings Courts, whither all persons may resort; and in no chambers, or other private places: for the Judges are not Judges of chambers, but of Courts, and therefore in open Court, where the parties Councel and Attorneys attend, ought orders, rules, awards, and Judgments to be made and given, and not in chambers or other private places. . . . Nay, that Judge that ordereth or ruleth a Cause in his chamber, though his order or rule be just, yet offendeth he the Law, (as here it appeareth) because he doth it not in Court.

9

*Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 420 n.5, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979) (quoting 2 E. Coke, Institutes of the Laws of England 103 (6th ed. 1681));[9] *see also Richmond Newspapers, Inc.*, 448 U.S. at 565 n.6, (plurality opinion) (discussing Coke's interpretation of the Statute of Marlborough).

Thus, it appears that the word "open" in America's open courts provisions originated in Coke's commentary on chapter 1 of the Statute of Marlborough and was later shortened and grafted onto Penn's transplant of Magna Carta's chapter 40. While Washington retained the "open" part of this history, it applied that language to the administration of justice rather than to simply the courtroom.

The open courts doctrine has its foundation in the Magna Carta and in the view of that document by early legal commentators. No history exists which suggests whether or not the change made by the Oregon and Washington Constitutions from open courts to open administration of justice was meant to vary from the original model. The textual language suggests that Washington should provide even greater "openness" in judicial proceedings than was available under the traditional language. We conclude, that the requirement that justice be openly administered includes, at a minimum, the long recognized right of the public to attend court proceedings. The provision is not expressed

---

[9] Coke's commentary is to the earlier quoted section from the 1267 Statute of Marlborough.

as an individual right, but as a command to the judiciary. In our view, the text and history of this provision compels the conclusion that § 10 creates a right held by all Washingtonians.

*Power of Judges at Chambers*

The Washington Constitution also adopted a provision in 1889 that is relevant to the interpretation of art. I, § 10. It is art. IV, § 23.

§ 23 provides for superior court commissioners and explains their authority in this manner:

> **§ 23 COURT COMMISSIONERS.** There may be appointed in each county, by the judge of the superior court having jurisdiction therein, one or more court commissioners, not exceeding three in number, **who shall have authority to perform like duties as a judge of the superior court at chambers**, subject to revision by such judge, to take depositions and to **perform such other business connected with the administration of justice** as may be prescribed by law.

(Emphasis added.)

The meaning of the phrase "at chambers" under our constitution has had a somewhat turbulent history in Washington. When it first tackled the question of defining judges' powers at chambers under this provision, the Washington Supreme Court adopted the definition from the territorial statutes. *Peterson v. Dillon*, 27 Wash. 78, 84, 67 P. 397 (1901). It did so in the belief that these were the powers that the framers were familiar with and thus had in mind when the constitution was enacted. *Id.* at 83-84. The

11

Territorial Code of 1881, cited in *Peterson*, stated that judges at chambers may "entertain, try, hear, and determine all actions, causes, motions, demurrers, and other matters not requiring a trial by jury." Code of 1881, § 2138.[10] The commissioner sitting in *Peterson* had entered an order of default in chambers and later tried the case in chambers and entered judgment in favor of the plaintiff for damages, costs, and fees. *Peterson*, 27 Wash. at 81.

A few years later, the Supreme Court overturned *Peterson* and held that art. IV, § 23, should be interpreted by reference to judges' current powers at chambers rather than the powers that existed at the time of the constitutional convention. *State v. Philip*, 44 Wash. 615, 617, 87 P. 955 (1906) ("[W]e cannot believe that the framers of the constitution intended to define the powers of important judicial officers by reference to the legislation of a government which was about to pass out of existence forever."). The court then cited *Laws of 1891*, chapter 54, p. 91, as the guiding statute for identifying judges' powers at chambers. *Id.* This statute remains unchanged and in effect today, and reads: "A judge may exercise out of court all the powers expressly conferred upon a judge as contradistinguished from a court and not otherwise." RCW 2.28.050.

---

[10] Authority under this statute later was described as the power to act at any time. *Kalb v. German Sav. & Loan Soc'y*, 25 Wash. 351, 65 P. 559 (1901) (territorial judge had authority to try quiet title action in chambers).

The Supreme Court two years later called *Philip* into doubt by suggesting that perhaps superior court judges have no powers at chambers whatsoever, implying that RCW 2.28.050 was an empty enactment. *See Howard v. Hanson*, 49 Wash. 314, 318, 95 P. 265 (1908). "What was intended by the constitution makers to be included in the first of these grants of power is not clear, as they had in a prior section of the constitution provided that the superior courts should always be open for the transaction of business, and thus eliminated the distinction that formerly existed between the powers of a judge during term time and his powers after the adjournment of the term, doing away with the sittings of the court at chambers altogether." *Id.*[11]

However, when faced with the question of a judge's powers at chambers the following year, the court stated: "it cannot be successfully contended that an act done by a judge sitting on the bench where no jury is required has any greater legal force than the same act done by him in an adjoining room by courtesy styled his chambers." *Meisenheimer v. Meisenheimer*, 55 Wash. 32, 42-43, 104 P. 159 (1909).

---

[11] The *Philip* court had believed that there was a need for judges to have some powers at chambers. *Philip* reasoned as follows:

> There may be little necessity for conferring any considerable power on a judge at chambers, when the court over which he presides is always open, yet the fact that a court is always open is not necessarily incompatible with the exercise of certain judicial functions by the judge of that court at chambers; at least the framers of the constitution did not so consider it. Nor has the legislature [, which enacted RCW 2.28.050].

*Philip*, 44 Wash. at 617.

13

Almost twenty years later, the interpretation did change again when the Supreme Court overturned *Philip*, reinstated *Peterson*, and held that art. IV, § 23, should be interpreted by reference to judges' powers at chambers as they existed at the time of the constitutional convention. *State v. Claypool*, 132 Wash. 374, 377, 232 P. 351 (1925). The court reasoned that "[i]f a court commissioner does not have the powers as they existed at the time of the adoption of the constitution, it is difficult to see just what the framers thereof had in mind when they provided that he should have such powers as a court at chambers, since in the other provision of the constitution [art. IV, § 6] they had provided that the court should always be open." *Id.*

This period of history suggests that our court was caught up in the historic battle that raged in Coke's day. Our court began, and ended, this period with the view that the constitution preserved the common law chambers power as modified by legislation. For a few years, the court turned to the view of Lord Coke that a judge could act only in court or not at all.

Judges' powers at chambers were originally derived from the common law. *See State v. Williams*, 341 Wis.2d 191, 212 n.15, 814 N.W.2d 460 (2012).[12] The common

---

[12] For a history on how the term "at chambers" and the powers that went with it developed, see *Von Schmidt v. Widber*, 99 Cal. 511, 512-14, 34 P. 109 (1893).

14

law is subject to legislative modification, but it applies unless it is inconsistent with the constitution and laws of Washington. RCW 4.04.010.

Art. IV, § 23 appears to have its origins in the constitutions of California,[13] Wisconsin,[14] and Minnesota.[15] Rosenow, p. 626 n.53. The Wisconsin Supreme Court early in that state's history held that the power of judges at chambers "was subject to legislative modification." *Williams*, 341 Wis.2d at 211 (discussing *In re Remington*, 7 Wis. 541, 552-55 (1858)). In California and Minnesota, the constitutional chambers powers of its commissioners are also determined with reference to the statutory powers of regular judges at chambers. *In re Roberts' Estate*, 49 Cal. App. 2d 71, 76-77, 120 P.2d 933 (1942); *Hoskins v. Baxter*, 64 Minn. 226, 229-30, 66 N.W. 969 (1896).

Washington's definition of this power by legislation is consistent with the 19th century practices in other states with similar constitutional provisions. Several Washington statutes followed the lead of RCW 2.28.050 in distinguishing between a judge's powers and the court's powers. *See, e.g.*, RCW 2.08.190, .200.

Washington thus recognized at the time of adopting its constitution that judges had authority to conduct business, other than trial, outside of the public courtroom. However, that authority was still subject to the command that it be "administered openly." Since

---

[13] CAL. CONST. art. VII, § 14 (1879).
[14] WIS. CONST. art VII § 23 (1848).
[15] MINN. CONST. art VI, § 15 (1857).

15

the same constitutional convention produced both provisions, the constitution appears to envision that judges can perform their activities "openly" without all activities taking place in public.

*Article I, § 10 in the Courts*

The explosion of litigation raising art. I, §§ 10 and 22 issues in the last several years makes any attempt at a comprehensive review out of date before the opinion even issues. Nonetheless, we believe that some historic review of the case law is in order to attempt to give meaning to the open administration of justice language of section 10.[16]

The first mention of the section 10 open justice right came in a criminal case, *State v. Gaines*, 144 Wash. 446, 258 P. 508 (1927). There the trial court indicated that it would close the courtroom the next day during expected testimony about the incestuous relationship between the defendant and his murdered daughter. The Washington Supreme Court declined to consider the issue as there was no evidence the courtroom ever closed, but indicated that it would have presented a serious issue under both sections 10 and 22 of article I. *Id.* at 462. The court also noted that both sections guaranteed a criminal defendant a public trial. *Id.*

---

[16] It appears the first case law mention of the provision is found in a case construing the constitutional limitations of a county's indebtedness and its ability to pay its court debts. *Rauch v. Chapman*, 16 Wash. 568, 48 P. 253 (1897). There the court recognized that the constitutional obligation to provide justice "without unnecessary delay" was a mandatory duty of the county. *Id.* at 575.

16

Criminal prosecutions also were at issue in the next cases to mention § 10. In one case, the court locked the door during the prosecutor's closing argument in order to avoid disruption. *State v. Collins*, 50 Wn.2d 740, 314 P.2d 660 (1957). As there was no objection by the defense and there were members of the public present, the court found no prejudicial error that deprived the defendant of his art. I, § 10 and § 22[17] public trial rights. *Id.* at 745-48. A challenge to the closure of a juvenile court trial was at issue in *In re Lewis*, 51 Wn.2d 193, 316 P.2d 907 (1957). The court rejected an art. I, § 10 challenge to former RCW 13.04.090, repealed by *Laws of* 1961, ch. 302 §17, which had permitted the trial court to close juvenile delinquency proceedings. *Id.* at 197-200.

The next series of cases raising § 10 open justice issues involved press reporting of criminal trials. The first of these is *State ex rel. Snohomish County Superior Court v. Sperry*, 79 Wn.2d 69, 483 P.2d 608 (1971). There the superior court had found two reporters in contempt for reporting the results of a suppression hearing that had resulted in the exclusion of some evidence at trial. The contempt ruling was reversed on the authority of the First Amendment and art. I, § 10. *Id.* at 75-78.

An order barring the press and public from a pretrial suppression hearing was upheld against an art. I, § 10 challenge in *Federated Publication, Inc. v. Kurtz*, 94 Wn.2d

---

[17] This provision was referred to as the "tenth amendment" in *Collins*. 50 Wn.2d at 745. The tenth amendment to the Washington Constitution amended § 22 to add the venue provision for crimes committed in transit.

51, 615 P.2d 440 (1980). There the trial court had closed the courtroom for the hearing after the appellant newspaper had previously published damaging evidence that resulted in a change of venue. Noting the conflict between the defendant's right to a fair trial guaranteed by art. I, § 22 and the public's right to access the criminal trial guaranteed by § 10, the court for the first time applied the five factor balancing test suggested by the concurring opinion of Justice Powell in *DePasquale*, 443 U.S. at 400-01. *Kurtz*, 94 Wn.2d at 62-64. The court also explicitly recognized that the § 22 right did not apply to the public. *Id.* at 59.

The five factor test was refined and applied to another art. I, § 10 claim in *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982). There the trial court had closed a pretrial motion to dismiss a murder prosecution and declined to release a transcript of the proceedings even after the murder trial had ended. Based on the lack of an adequate record to determine that the closure was justified, the court remanded for the trial judge to determine if the sealing was still necessary. *Id.* at 45.

*Seattle Times Co. v. Eberharter*, 105 Wn.2d 144, 713 P.2d 710 (1986), involved a petition by a newspaper for a writ of mandamus to compel disclosure of a search warrant affidavit. The court concluded that art. I, § 10 did not extend to investigatory process and was not applicable before charges had been filed. *Id.* at 155-57. The court also cited *Ishikawa* for the proposition that art. I, § 10 provided "a right of access to (1) trials, (2)

18

pretrial hearings, (3) transcripts of pretrial hearings or trials, and (4) exhibits introduced at pretrial hearings or trials." *Id.* at 155.

§ 10 was used to invalidate a statute that protected the names and identifying information of child sexual assault victims in *Allied Daily Newspapers of Washington v. Eikenberry*, 121 Wn.2d 205, 848 P.2d 1258 (1993). The court concluded that § 10 required that the *Ishikawa* factors be applied on an individualized basis each time a court closure is considered. By imposing a blanket closure of the identifying information, the statute ran afoul of the constitutional provision. *Id.* at 209-12.

The related issue of press or public access to closed portions of a public record also presents § 10 issues. The first of those cases was *Cohen v. Everett City Council*, 85 Wn.2d 385, 535 P.2d 801 (1975). That case involved a writ of certiorari to superior court from a license revocation action by a city council that heard the matter in a closed session at the request of the licensee. The licensee then had the hearing record sealed except for use by the trial judge. The local newspaper was allowed to intervene and sought to set aside the confidentiality order that had sealed the record. *Id.* at 386. The Washington Supreme Court held that art. I, § 10 guaranteed a public trial in civil cases. *Id.* at 388-89. It went on to reverse the sealing order, reasoning that the hearing record would be the testimony before the superior court and therefore "became public property" that would be made part of the public record. *Id.* at 389.

19

*Modern Cases*

The modern explosion of cases traces to *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995). There the court dealt with a criminal prosecution that had seen a closed pretrial hearing designed to protect an undercover officer's identity. The court concluded that the *Ishikawa* standards used in § 10 cases were required to be applied in criminal cases governed by § 22 since the two sections served complementary functions. *Id.* at 259.

The large number of § 22 criminal cases resulted in numerous opportunities to apply the *Ishikawa* standards across a variety of fact patterns. Those analyses would inform civil cases raising solely § 10 arguments just as the § 10 cases informed many criminal cases. *E.g., State v. Sublett*, 176 Wn.2d 58, 292 P.3d 715 (2012) (adopting "experience and logic test" for determining whether courtroom was closed); *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009) (in chambers voir dire); *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009) (no structural error when defendant joined in closing courtroom during voir dire).

The court has found the purpose of the open courtroom provisions of § 22 and the Sixth Amendment, are

> to ensure a fair trial, to remind the officers of the court of the importance of their functions, to encourage witnesses to come forward, and to discourage perjury.

20

*State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005).

Applying the *Ishikawa* standards, the court concluded that closure of a pretrial hearing at one criminal codefendant's request violated the other codefendant's right to a public trial under § 22 in *State v. Easterling*, 157 Wn.2d 167, 137 P.3d 825 (2006). The court also noted that the public's rights under § 10 were violated when the court cleared the spectators from the courtroom. *Id.* at 179-80.

The contours of the open administration of justice provision outside of the trial context also have come into clearer focus. One criminal case presenting such an issue was *State v. Beskurt*, 176 Wn.2d 441, 293 P.3d 1159 (2013). There a criminal defendant challenged the sealing of juror questionnaires after jury selection. The court concluded that the defendant's § 22 rights were not violated.[18]

In several cases, our court has applied § 10 to analyzing whether or not documents created in civil litigation became part of the record either for disclosure or record sealing purposes. *Bennett v. Smith Bunday Berman Britton, PS*, 176 Wn.2d 303, 291 P.3d 886 (2013) (intervenor failed in attempt to unseal proprietary documents submitted to, but not considered by, the trial court); *State v. McEnroe*, 174 Wn.2d 795, 279 P.3d 861 (2012)

---

[18] The lead opinion for four justices also rejected a Court of Appeals conclusion that § 10 had been violated. *Beskurt*, 176 Wn.2d at 448. Two other justices disagreed with the lead opinion's treatment of the issue, but concurred in the result. *Id.* at 457-59. The remaining justices did not address the issue.

(defendant allowed to withdraw documents after preliminary ruling; § 10 and GR 31 did not apply to documents not in court record); *Tacoma News, Inc. v. Cayce*, 172 Wn.2d 58, 256 P.3d 1179 (2011) (§ 10 did not grant press access to deposition taken in courtroom, but not introduced at trial); *Rufer v. Abbott Labs.*, 154 Wn.2d 530, 114 P.3d 1182 (2005) (documents filed with trial court are presumptively open; § 10 required that sealing of materials submitted to trial court permissible only when compelling interests overrides public's interest in open administration of justice); *Dreiling v. Jain*, 151 Wn.2d 900, 93 P.3d 861 (2004) (newspaper intervened to challenge sealing ruling; court finds that motion to terminate derivative suit was equivalent of summary judgment and documents could not be sealed without showing of compelling need).[19]

Issues relating to courtroom closure also have continued to present questions regarding the scope of § 10. A closure issue was presented by operation of a court rule, MPR 1.3, in *In re Detention of D.F.F.*, 172 Wn.2d 37, 256 P.3d 357 (2011). There all nine justices agreed that the rule, which closed involuntary commitment proceedings unless the subject of the hearing requested that it be open, violated § 10. No opinion

---

[19] Access to court documents is also litigated in other manners, including the use of GR 31, the Public Records Act, ch. 42.53 RCW, and the common law right of access to the courts. *See generally City of Federal Way v. Koenig*, 167 Wn.2d 341, 217 P.3d 1172 (2009).

gathered a majority of the court, which fractured primarily on the remedy issue and how to approach it.

Several principles applicable to this case can be distilled from the case law. Because both use the same *Ishikawa* analysis, § 22 case authority can be useful in analyzing open justice issues presented in a civil case, but that provision is limited to criminal cases and does not apply in a civil action. *Kurtz.* There is a § 10 right to a public trial in civil cases. *Cohen.* The § 10 right to public access is not limited solely to open courtrooms, but also applies in some circumstances to documents filed with the court. *E.g., Rufer*; *Cohen.* The press many times has asserted § 10 to view proceedings or filings in both criminal and civil cases. *E.g., Ishikawa*; *Dreiling.* Other members of the public have also asserted their right of access under § 10. *Bennett.*

*Appellant's Contentions*

After this overly long review of history, it is finally time to address Mr. Reyes's specific arguments. He claims that the court erred in "closing" his motion hearing without first applying the *Ishikawa* factors to the closure. He asserts this argument on his own behalf as well as that of the public at large. His arguments require us to address

23

whether or not § 10 applied to his hearing, whether we can review his personal claim in this proceeding, and his standing to assert the argument on behalf of others.[20]

We address the noted issues in the order stated.

*§ 10 Applied to a Pretrial Hearing in Civil Case*

The initial issue presented is whether or not the motion to dismiss needed to be heard in open court. This is a close issue, but we conclude that because the court heard argument in the case, it was required to conduct a public hearing.

Two constitutional provisions arguably conflict in this case. The judge's constitutional authority to decide matters at chambers appears to extend to pretrial hearings since the judge (or commissioner) could try all nonjury matters in chambers. *Peterson*, 27 Wash. at 81 (commissioner entered default in chambers and later tried case in chambers to enter amount of default judgment); *Kalb*, 25 Wash. at 358 (territorial judge had authority to try quiet title action in chambers). We know of no authority that required the trial court to hear argument on this motion, which could have been decided in chambers on the basis of the motion pleadings since no testimony was taken. These reasons suggest that the matter need not have been decided at a public hearing.

---

[20] In light of our resolution of these claims, we specifically do not decide what the appropriate remedy for a § 10 violation would have been under the facts of this case. Because of the chambers power, it is unclear that the remedies for a § 22 violation apply to a § 10 violation.

24

In contrast, the open courtroom mandate has clearly been applied to pretrial hearings in criminal cases. *Easterling*; *Bone-Club*. It also applies to materials filed in support of motions to dispose of a civil case. *Dreiling* (motion to terminate shareholder derivative suit). We have little doubt that if the court had heard evidence in support of the motion to dismiss this case that § 10 would have required that it be heard in the public courtroom. Some of the purposes of the open courtroom requirement are "to encourage witnesses to come forward, and to discourage perjury." *Brightman*, 155 Wn.2d at 514. Those purposes are just as important in civil litigation as in criminal litigation, and we believe § 10 shares those same purposes with § 22.

However, it is the nature of the hearing, not whether or not evidence is taken, that determines whether an open hearing is required.[21] If, as *Dreiling* held, the materials supporting a dispositive motion must be open to the public, then certainly the motion hearing itself had to be open. We hold that when a dispositive motion is *argued* to the court in a civil case, it should be heard in the courtroom or other facility open to the public. Any waiver of the public forum will have to take place in the courtroom in accordance with the *Ishikawa* guidelines.

---

[21] Similarly, a hearing is still a hearing no matter where or how it is heard. The right to a public hearing is not dependent upon the technology in use or the courtroom's ability to field that technology. Thus, it may be difficult to move many modern communication methods into the public arena, but that will be necessary if they are to be employed for hearings or trial.

It was error to hear the motion in chambers. However, that does not necessarily mean that Mr. Reyes is entitled to relief. He did not assert his right to have the hearing in public and that fact weighs heavily in our discussion of the next issue.

*Manifest Constitutional Error*

The general rule in Washington is that an appellate court will not consider an issue on appeal which was not first presented to the trial court. RAP 2.5(a); *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988). However, RAP 2.5(a)(3) permits a party to raise initially on appeal a claim of "manifest error affecting a constitutional right." The error must be both (1) manifest and (2) truly of constitutional magnitude. *Id*. at 688. It is "manifest" if it either (1) "results in actual prejudice to the defendant," or (2) the party has made a "plausible showing" that the error had "practical and identifiable consequences" to the trial. *State v. WWJ Corp.*, 138 Wn.2d 595, 602-03, 980 P.2d 1257 (1999) (citations omitted and internal quotation marks omitted).

RAP 2.5(a) "makes no distinction between civil and criminal cases . . . [w]e have recognized that civil parties may raise constitutional issues on appeal if they satisfy the criteria listed in RAP 2.5(a)(3)." *WWJ Corp.*, 138 Wn.2d at 601. As a member of the public, Mr. Reyes had the right to a public hearing under § 10; his alleged error is of constitutional magnitude. *In re Dependency of J.A.F.*, 168 Wn. App. 653, 662, 278 P.3d 673 (2012); *In re Det. of Ticeson*, 159 Wn. App. 374, 382, 246 P.3d 550 (2011).

26

That does not mean he has satisfied the "manifest" prong of the rule. *J.A.F.*, 168 Wn. App. at 662; *Ticeson*, 159 Wn. App. at 383. It is still his burden, since he did not object in the trial court, to establish either actual prejudice or a plausible theory of how he was harmed by the closure of the hearing on his motion to dismiss. *Ticeson*, 159 Wn. App. at 383. He has made no attempt to meet his burden on appeal and fails to articulate any theory of why his motion to dismiss would have been treated differently if argued in public.[22]

Instead, as in *J.A.F.* and *Ticeson*, Mr. Reyes argues that the presumption of prejudice applied in § 22 criminal cases should apply to his case. We agree with those courts that it does not. *J.A.F.*, 168 Wn. App. at 662; *Ticeson*, 159 Wn. App. at 383. Washington typically treats the erroneous closure of a criminal case as a form of structural error. *E.g.*, *Wise*, 176 Wn.2d at 14-15, 18-19; *but see Momah*, 167 Wn.2d 140 (not structural error where defense participated in closing courtroom). The doctrine of structural error has never yet been applied to a civil case.[23] That is unsurprising since the

---

[22] He does not assign error to the denial of his motion to dismiss nor otherwise argue in this appeal that the trial court erred.

[23] Wrongful deprivation of counsel in a criminal case is recognized as structural error. *Neder v. United States,* 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (citing *Gideon v. Wainright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). In an earlier SVP case, the denial of counsel was treated by the plurality opinion as a question of harmless error. *In re the Det. of Kistenmacher,* 163 Wn.2d 166, 174, 178 P.3d 949

27

doctrine was designed to address errors that "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence.'" *Neder v. United States*, 527 U.S. 1, 8-9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (citation omitted). A majority of the Washington Supreme Court rejected the argument that structural error applied to a civil proceeding in *D.F.F.* 172 Wn.2d at 48 (J.M. Johnson, J. concurring); 52-57 (Madsen, C.J., dissenting).

Following *J.A.F.* and *Ticeson*, as well as the majority of the court in *D.F.F.*, we conclude that structural error does not apply to a violation of § 10 in a civil case.

*Ticeson* pointed out another reason why the public trial right should be asserted in the trial court. Many fundamental criminal rights, including those guaranteed by § 22, can only be waived in a knowing, intelligent, and voluntary manner.[24] That is, the court must determine that the defendant knew the right existed and was knowingly waiving it. *Ticeson*, 159 Wn. App. at 383. That standard, however, is problematic when applied to § 10:

> But if the same test applies to Section 10 rights, the court would be required to ensure, sua sponte, that all parties (and possibly, everyone in the courtroom), know about and waive any rights under Section 10. Otherwise, the losing party may raise the issue for the first time on appeal, and the only

---

(2008). Only the dissenting opinion of J. Sanders considered the issue structural error. *Id.* at 185-86.

[24] There are other constitutional rights that are waived unless asserted. *See, e.g., Strode*, 167 Wn.2d at 235 (Fairhurst, J., concurring).

remedy is reversal. This is an unjust and costly proposition and the rule does not permit it. A party who perceives a possible violation of Section 10 must make its argument to the trial judge, thereby ensuring a record for review.

*Id.* We agree.

Another cause for concern is that under *Momah,* not even all § 22 closures necessarily are structural error. It is difficult, therefore, to conclude that § 10 violations would necessarily have to be structural error.

For all of these reasons, we conclude that Mr. Reyes has not established that the § 10 error was manifest and he cannot raise that claim in this appeal. We therefore turn to his claim that the public's rights were violated independent of his own right.

*Assertion of Public's Rights under § 10*

Apart from his own right under § 10, Mr. Reyes argues that the rest of the public also had a right to attend the hearing and that he can assert that right for this first time in this appeal. We conclude that he lacks standing under the settled standards that govern third party standing in Washington.

In both civil and criminal actions, Washington applies the standing test used by the United States Supreme Court. *T.S. v. Boy Scouts of Am.,* 157 Wn.2d 416, 424 n.6, 138 P.3d 1053 (2006) (citing *Mearns v. Scharbach,* 103 Wn. App. 498, 512, 12 P.3d 1048 (2000)); *State v. Burch,* 65 Wn. App. 828, 837, 830 P.2d 357 (1992).

29

> In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties. . . . We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the dispute, . . . the litigant must have a close relation to the third party, . . . and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Powers v. Ohio*, 499 U.S. 400, 410-11, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) (internal citations omitted).

Mr. Reyes fails to satisfy any of these requirements, let alone all of them. First, he makes no showing of "injury in fact." Indeed, if he had been able to do so, he would have satisfied RAP 2.5(a)(3) and we would have heard his claim directly. Second, Mr. Reyes has no close relationship to the general public. While it is his own standing as a member of the public that gave him the right to assert a § 10 claim, he has no more special interest to the rest of the public than anyone else.

Finally, there was no impediment to the public asserting its rights that would have justified Mr. Reyes asserting the public's rights. The history of § 10 litigation in this state shows that the press has regularly asserted its open administration of justice right in both criminal and civil cases. *E.g., Ishikawa; Dreiling.* Private citizens likewise have asserted the right. *Bennett.* Nothing in the record of this case suggests that the public's ability to assert itself into the pretrial hearing was hindered in some manner. Mr. Reyes

30

has not established that he should have third party standing to assert the § 10 argument apart from his own right to do so.

Mr. Reyes does argue that the issue was decided in his favor in *D.F.F.* It was not. First, the lead opinion that found standing spoke only for four members of the court. Second, the discussion in *D.F.F.* was aimed at rejecting the State's argument that the appellant's sole right under § 10 was to be present for her own civil commitment trial. *D.F.F.*, 172 Wn.2d at 39. Instead, the court reasoned that appellant's rights under § 10 extended to having the public attend her commitment hearing. *Id.* at 39-41. The appellant in *D.F.F.* did not argue, and the court did not address, whether the appellant independently could assert the public's own right to attend the hearing. It simply was not in issue.

*D.F.F.* does, however, help explain the contours of the § 10 right in the context of trial (and other open hearing) proceedings. The public has a right to attend. The litigant has the right to attend for the same reason—as a member of the public (since, unlike the criminal defendant, there is no specific constitutional provision declaring a litigant's individual right to a public civil trial). Concomitant with the general right to attend held by everyone, the litigant's attendance right necessarily recognizes that others can be present as well.

31

Policy reasons, which were touched on in *Ticeson*, also compel the result reached by the standing discussion. The right to an open hearing recognized by § 10 is a general public right that a civil litigant shares with everyone. Since it is not a particularized individual right, the litigant who asserts the public's right to attend is asserting the very same right that ensures his public hearing. We see no policy reason for splitting § 10 into litigant and general public attendance rights. If a litigant declines, perhaps for tactical reasons,[25] to assert his own right to a public hearing, we do not see why he should be allowed to assert someone else's right to attend. This essentially gives a litigant the ability to try the case in his preferred manner (without public scrutiny) but obtain a new trial if things do not go in his favor.[26]

We conclude that Mr. Reyes lacks standing to assert the right of others to have attended his hearing. We also can discern no valid interest in allowing a litigant to assert a right for others that he declined to assert for himself. For both reasons, Mr. Reyes cannot argue that the public was wrongly excluded from his motion hearing.

---

[25] Other SVP respondents have argued unsuccessfully that the court erred by failing to close proceedings. *E.g., In re Det. of Turay*, 139 Wn.2d 379, 413-15, 986 P.2d 790 (1999); *In re Det. of Campbell*, 139 Wn.2d 341, 355-56, 986 P.2d 771 (1999).

[26] This would be a dangerous approach to take. Since civil cases typically do not involve double jeopardy concerns, it also is possible that a successful litigant could have his trial victory unwound by the opposing side.

32

CONCLUSION

In summation, we conclude that when a motion to dismiss a civil case is argued to the bench, it must be heard in public absent a waiver of the article I, § 10 right of the public to be present. A civil litigant shares that right of a public hearing with the general public and has no special right as a litigant. The litigant who fails to assert the right to a public hearing must show how he was prejudiced by the closure. A litigant who did not assert his own right to a public hearing lacks standing to assert the public's right. For all of these reasons, we affirm the sexually violent predator determination.

Affirmed.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.

SUFFICIENCY OF THE EVIDENCE

Mr. Reyes also argues that the evidence was insufficient to support the commitment decision because there was no evidence of adult behavior that would justify the pedophilia diagnosis. That argument actually addresses the weight of the evidence rather than the sufficiency of the evidence. Properly viewed, we believe the evidence supported the bench verdict.

RCW 71.09.060 authorizes the civil commitment of those persons meeting the statutory definition of sexually violent predator. An SVP is

> any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility.

RCW 71.09.020(18).

Challenges to the sufficiency of the evidence in SVP determination are evaluated using the same criteria courts use for criminal convictions. *In re Det. of Thorell*, 149 Wn.2d 724, 744, 72 P.3d 708 (2003). This is because the SVP statute requires proof beyond a reasonable doubt. *Id.* In a sufficiency challenge, the evidence is viewed in the light most favorable to the State, with all reasonable inferences drawn in favor of the State and interpreted most strongly against the respondent. *In re Det. of Audett*, 158 Wn.2d 712, 727, 147 P.3d 982 (2006). A commitment will be upheld only if any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Id.* at 727-28. Circumstantial evidence and direct evidence carry equal weight. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). Credibility determinations are for the trier of fact and are not subject to review. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

34

Evidence that "an SVP suffers from a mental illness, . . . coupled with the person's history of sexually predatory acts, must support the conclusion that the person has serious difficulty controlling behavior, although this evidence need not rise to the level of demonstrating the person is completely unable to control his or her behavior." *Thorell*, 149 Wn.2d at 742. Clinical and actuarial assessments of future dangerousness are admissible in SVP commitment hearings. *Id.* at 756.

At trial, Douglas Tucker, M.D., a psychiatrist, testified that he reviewed Mr. Reyes's records, interviewed him for approximately three hours, and administered tests designed to predict the risk of reoffending. These tests included the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R) and the Static-99, another predictive test. These tests predicted a range of between 39 percent and 70 percent risk of Mr. Reyes reoffending within 5 to 10 years of release.

Dr. Tucker diagnosed Mr. Reyes with three paraphilias:[27] pedophilia (both male and female), Frotteurism,[28] and exhibitionism. The pedophilia diagnosis was made pursuant to the guidelines contained in the *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* (4th rev. ed. 2000) (DSM-IV-

---

[27] Paraphilia is a psychiatric disorder of sexual deviance.
[28] Frotteurism is the recurrent intense sexual arousing fantasies, sexual urges or behaviors involving the touching or rubbing against nonconsenting persons for sexual gratification.

35

TR). Dr. Tucker also diagnosed Mr. Reyes with polysubstance abuse (alcohol, marijuana, and intranasal cocaine), attention deficit/hyperactivity disorder, and cognitive disorder not otherwise specified, and antisocial personality disorder.

Dr. Tucker produced two reports which summarized his findings. The reports summarize other incidents of inappropriate sexual behavior by Mr. Reyes while at the SCC. These include exhibitionism and public masturbation, attempts to touch staff inappropriately, and sexual behavior with other patients. Dr. Tucker testified Mr. Reyes's mental abnormalities made it likely he would engage in predatory acts of sexual violence if not confined in a secure facility.

Robert Halon, Ph.D., a forensic psychologist testified at trial and via video deposition. Dr. Halon met with Mr. Reyes on three separate occasions for a total of about six and one-half hours. Dr. Halon performed two tests on Mr. Reyes: the Shipley Living Scale IQ test and the Rorschach inkblot test.

Dr. Halon concluded that Mr. Reyes's intelligence was above mental retardation, but was in the borderline range of functioning. The Rorschach results showed Mr. Reyes to be aware of right from wrong and to have a serious impairment in perceiving the meaning of events and in reading people. Dr. Halon testified that Mr. Reyes had volitional control over his actions; he based that belief on the opinions of three doctors at Eastern State Hospital who had assessed Mr. Reyes for competency to stand trial.

36

Dr. Halon also disagreed with Dr. Tucker's diagnosis of paraphilias because there was no evidence in the record to support finding recurrent intense sexually arousing fantasies and sexual urges for deviant sex. Dr. Halon testified that committing the acts themselves was not sufficient to prove they were motivated by fantasies or urges. Dr. Halon characterized Mr. Reyes's sex acts as knee jerk reactions resulting from immaturity. Dr. Halon also did not believe that Mr. Reyes's brain damage could be the cause of his acting out sexually because the acting out did not occur nonstop.

The trial court accepted the testimony of Dr. Tucker and found the existence of the three paraphilias. On appeal, Mr. Reyes argues that Dr. Tucker's belief in the presence of pedophilia, the only diagnosed condition that could lead to future acts of predatory violence, was not supported in the record.[29] Specifically, he argues that predatory behavior against young boys occurred when Mr. Reyes himself was 14 and that the DSM-IV-TR does not support the diagnosis because Mr. Reyes was too young to meet its definition.

DSM-IV-TR sets forth three criteria necessary for a diagnosis of pedophilia: (1) the person has recurrent, intense sexually arousing fantasies, sexual urges, or behaviors

---

[29] This is the sole SVP criterion at issue. Mr. Reyes agrees that his first degree child rape conviction satisfies the prior criminal history criterion. First degree child rape is one of the crimes of sexual violence which qualifies a person for SVP status. RCW 71.09.020(17).

involving sexual activity with a prepubescent child or children (generally age 13 years or younger), occurring over a period of at least 6 months; (2) the person has acted on these urges, or they must have caused marked distress or interpersonal difficulty; and (3) the person must be at least 16 years old and at least 5 years older than the child or children referenced in the first criterion. According to Dr. Tucker's written basis for his diagnosis:

> The legal and mental health record has established that Mr. Reyes was convicted of two sexual offenses involving two underage boys (ages 8 and 9) and two underage girls (ages 5 and 9), with the offenses separated by more than three years (from 1997 to 2000, when Mr. Reyes was ages 14 and 17, respectively). Based on the facts established in the official record, therefore, Mr. Reyes is diagnosed with Pedophilia.

Clerk's Papers at 32.

The defense expert, Dr. Halon, challenged Dr. Tucker's diagnosis on this very basis. In response, Dr. Tucker explained how the DSM-IV-TR definitions all are intended as guidelines rather than mandatory requirements. The trial judge, as trier of fact in this case, was free to believe Dr. Tucker's view of the significance of Mr. Reyes's age with regard to his condition.

A trial court has broad discretion in admitting expert evidence and a party may introduce expert testimony if the expert is properly qualified, relied on generally accepted theories, and is helpful to the trier of fact. ER 702; *Philippides*

38

*v. Bernard*, 151 Wn.2d 376, 393, 88 P.3d 939 (2004). An expert must have a

sufficient factual foundation for his or her opinion. *Queen City Farms, Inc. v.*

*Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 104, 882 P.2d 703 (1994). Here,

the trial court did not abuse its discretion in concluding that Dr. Tucker was

properly qualified to exercise his clinical judgment to deviate from the DSM-IV-

TR and rely partially on the 1997 first degree child rape conviction in diagnosing

Mr. Reyes as a pedophile. The DSM-IV-TR itself provides for such deviations

from the requirements when the expert thinks it is appropriate. DSM-IV-TR at

xxxii.

Thus, we view this challenge as properly going to the weight to be given

Dr. Tucker's evaluation rather than as a missing element to his diagnosis. The

trial court was free, as it did, to accept this evaluation. Accordingly, the evidence

was sufficient. *Audett*, 158 Wn.2d at 727-28.

The judgment is affirmed.

_____
Korsmo, C.J.

WE CONCUR:

_____
Brown, J.

_____
Kulik, J.

39